Jane TURNER, et al., Appellants,

v.

SCHOOL DISTRICT OF CLAYTON, et al., Respondents.

No. SC 90236.

Supreme Court of Missouri, En Banc.

July 16, 2010.

Rehearing and Modification Denied Aug. 24, 2010.

Elkin L. Kistner and Sean M. Elam, Jones, Bick, Kistner & Jones PC, St. Louis, for the parents.

Mark J. Bremer and D. Leo Human, Kohn, Shands, Elbert, Gianouliakis & Giljum LLP, St. Louis, for the Clayton school district.

Richard B. Walsh Jr. and Evan Z. Reid, Lewis, Rice & Fingersh LC, St. Louis, for the transitional school district.

PER CURIAM.

The dispositive issue in this case is the declaration that the straightforward and unambiguous language of § 167.131, RSMo 2000,[1] applies as written. Plaintiffs are parents and children who reside in the City of St. Louis transitional school district[2] but attend schools in the Clayton school district pursuant to tuition agreements. After the transitional school district lost its state accreditation, the parents and children sued the Clayton school district, the board of education of the City

---

1. Unless otherwise noted, all references to § 167.131 and § 167.1060 are to RSMo 2000. All other statutory references are to RSMo Supp.2009.

2. With the St. Louis public school district's loss of accreditation in 2007, the special administrative board of the transitional school district is the governing body of the St. Louis public school district. For the purpose of simplicity, this respondent will simply be referred to as the transitional school district.

of St. Louis and the transitional district of the City of St. Louis claiming the transitional school district was required to pay their tuition pursuant to § 167.131. The parents and children claim the plain language of § 167.131 requires unaccredited school districts to pay the tuition costs of its students who choose to attend an accredited school in an adjoining district.

The parents and the school districts both moved for summary judgment. The circuit court granted the school districts' motion for summary judgment finding that § 167.131 was inapplicable to the transitional school district of the City of St. Louis. The court of appeals issued an opinion, but because of the general interest and importance of the issues in this case, it transferred the case to this Court pursuant to Rule 83.02.

On appeal, the parents and children argue that § 167.131 requires the transitional school district to pay the children's tuition costs for attending schools in the Clayton school district. This Court holds that § 167.131's unambiguous mandatory language requires unaccredited school districts to pay the tuition of its students who choose to attend an accredited school in an adjoining district.[3]

## Facts

Jane Turner, Susan Bruker, Gina Breitenfeld and William Drendel and their children live within the boundaries of the transitional school district of the City of St. Louis. The parents' children currently attend schools in the Clayton school district pursuant to personal tuition agreements between the parents and Clayton.

In June 2007, after the parents had entered into tuition agreements for the 2007–

2008 school year, the transitional school district lost its accreditation. In response, one of the parents sent a letter to the Clayton school board asking it to charge the transitional school district for her children's tuition pursuant to § 167.131 rather than charge her pursuant to the tuition agreement. The Clayton school district declined to seek payment from the transitional district.

The parents filed suit against the transitional school district, the Clayton school district and the board of education for the City of St. Louis, seeking a declaratory judgment that because the transitional school district lost accreditation, it was required to pay the children's tuition for attending schools in the Clayton district. The parents' amended petition also asserted a claim for restitution for tuition already paid.

The Clayton school district and the transitional school district filed separate motions to dismiss or, in the alternative, for summary judgment. The transitional school district argued § 167.131 does not apply to the City of St. Louis transitional school district, claiming that SB 781, passed in 1998, exclusively governs student transfers in the district. Clayton's motion essentially restated the transitional school district's motion. Clayton's motion further argued that the "Safe Schools Act" gives school districts discretion to admit non-resident students from unaccredited districts under § 167.131 and that because Clayton refused to accept the children pursuant to that statute, their claims were foreclosed. Thereafter, the parents filed a cross-motion for summary judgment on the claims in their petition. The circuit court, without stating a specific basis,

However, the parents are required to pay tuition for the school year covered by the contracts with Clayton school district, and the

parents are not entitled to restitution for the amounts paid.

granted the school districts' motions for summary judgment.

## Standard of Review

 Whether summary judgment was proper is a question of law. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). This Court's review of a grant of summary judgment is essentially de novo; therefore, the trial court's order may be affirmed in this Court on an entirely different basis than that posited at trial, and this Court will affirm the grant of summary judgment under any appropriate theory. *Id.* at 376, 387–88; *Comp & Soft, Inc. v. AT & T*, 252 S.W.3d 189, 194 (Mo.App. 2008). The Court views the record in the light most favorable to the party against whom judgment was entered and affords that party the benefit of all reasonable inferences. *ITT Commercial Fin.*, 854 S.W.2d at 376. For summary judgment to be entered in its favor, the movant has the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *Id.* at 381.

## Analysis

Section 167.131, a straightforward and unambiguous statute, was specifically written to apply to the factual scenario of this case. Section 167.131 plainly states that the boards of unaccredited schools "shall pay the tuition of and provide transportation ... for each pupil resident therein who attends an accredited school in another district of the same or an adjoining county" and, furthermore, that "each pupil shall be free to attend the public school of his or her choice." Section 167.131.1, .2. It is clear that § 167.131 applies to the transitional school district, that it requires the Clayton school district to admit the students and that it mandates the transitional

school district pay the students' tuition. Once admitted, a student must comply with all disciplinary and academic standards in order to remain enrolled.

## Section 167.131 is Applicable to the Transitional School District

 The parents first claim that the circuit court erred in granting the transitional school district's motion for summary judgment because a plain reading of § 167.131 demonstrates that it applies to the transitional school district. They further assert that the plain and unambiguous language of § 167.131 mandates payment of their children's tuition under the circumstances presented in this case. This Court agrees.

Section 167.131 provides that a school district that loses accreditation with the state board of education must pay tuition for any resident pupil who attends an accredited school in another district in the same or an adjoining county and sets the amount of tuition to be paid by the sending school. Section 167.131 states:

1. The board of education of each district in this state that does not maintain an accredited school pursuant to the authority of the state board of education to classify schools as established in section 161.092, RSMo, shall pay the tuition of ... each pupil resident therein who attends an accredited school in another district of the same or an adjoining county.

2. The rate of tuition to be charged by the district attended and paid by the sending district is the per pupil cost of maintaining the district's grade level grouping which includes the school attended. The cost of maintaining a grade level grouping shall be determined by the board of education of the district ... Per pupil cost of the grade level grouping shall be determined by dividing th

cost of maintaining the grade level grouping by the average daily pupil attendance.... *Subject to the limitations of this section, each pupil shall be free to attend the public school of his or her choice.*

(emphasis added).

In the present case, it is uncontested that the St. Louis public school district lost its accreditation with the state board of education. Additionally, it is uncontested that the parents and their children reside in the City of St. Louis, but the children attend accredited schools in a school district in an adjoining county. Considering only the plain and ordinary language of § 167.131.1, the uncontested facts show that § 167.131 applies to the transitional school district under the circumstances present in this case.

The transitional school district challenges this plain reading of § 167.131 by arguing that § 167.131 was intended to apply only to situations in which an individual school in a district loses accreditation—not to deal with a district-wide loss of accreditation. The transitional school district argues that the legislative history of § 167.131 supports its position and that this Court should examine that history to divine the legislature's true intent.

■ The seminal rule of statutory construction is to ascertain the intent of the legislature from the language used and to consider the words used in their plain and ordinary meaning. *State ex rel. Unnerstall v. Berkemeyer,* 298 S.W.3d 513, 519 Mo. banc 2009). There is nothing in the language of § 167.131 indicating that the statute was not intended to apply to situations like the present, where a school district suffers a district-wide loss of accreditation. Under § 167.131, a school district is obligated to pay the tuition of its students who attend an accredited school if the district "does not maintain an accredited school." The fact that the entire St. Louis public school district lost its accreditation in 2007 necessarily means that it no longer maintains any accredited schools. Therefore, the plain language of § 167.131 encompasses the present situation. Because the plain and ordinary language of § 167.131 does not limit its application as urged by the transitional school district, there is no need to analyze the legislative history of the statute in an attempt to determine the legislative intent.

The transitional school district further argues that § 167.131 should not apply in the present case because the district maintains individual schools that are accredited by a private accreditation group. The fact that certain schools in the City of St. Louis may be accredited by a private organization is of no consequence. Section 167.131.1 speaks only of districts that do not maintain accredited schools "pursuant to the authority of the state board of education to classify schools." Accordingly, under § 167.131, the only relevant issue is whether the state board of education has classified the district or one of its schools as unaccredited. As noted above, it is undisputed that the St. Louis public school district lost its accreditation with the state board of education in 2007. Therefore, because the transitional school district does not maintain any schools accredited by the state department of education, it is unaccredited for purposes of § 167.131.

## Section 167.131 is not in Conflict with SB 781

■ The parents next claim the circuit court erred in granting summary judgment on grounds that § 167.131 was preempted by provisions in SB 781 and, therefore, that the transitional school district was not required to pay the students' tuition. The parents assert that the provisions at issue in SB 781 do not preempt

the application of § 167.131 to the transitional school district·because no conflicts exist between those provisions. In response, the school districts argue that the provisions in SB 781 apply specifically to the City of St. Louis and conflict with the generally applicable provisions of § 167.131 and, therefore, SB 781 should take precedence over § 167.131. Specifically, the school districts argue that § 162.1060, governing the publicly funded transfer of students out of the City of St. Louis, and § 162.1100, specifying how the city district will be governed in the event it loses accreditation, conflict with § 167.131.[4]

At the outset, it is noted that the school districts do not assert that SB 781 contains language expressly excluding the transitional school district from the application of § 167.131. The school districts' argument that SB 781 should operate to exclude the application of § 167.131 to the transitional school district is not based on any textual conflict that exists between the two laws. Instead, the school districts' argument is based on the fact that applying § 167.131 to the city district makes it more difficult to accomplish some of the statutory reforms mandated by SB 781.[5]

The school districts first argue that § 162.1060, as contained in SB 781, is in tension with § 167.131. Section 162.1060 created the "urban voluntary school transfer program" to transfer students between the City of St. Louis and St. Louis County to promote the desegregation of the city's schools. Section 162.1060.1. Under the 1999 federal desegregation order, to which § 162.1060 is subject, eligible black students residing in the City of St. Louis are transferred to participating school districts in the county, while certain white students residing in predominately white school districts in the county are transferred to magnet schools in the city.

The districts identify two principal tensions that exist between § 162.1060 and § 167.131. First, the districts point out that the funding mechanisms are different in that § 167.131 requires the unaccredited school district to pay the child's costs of attending another school, while transfers under § 162.1060 are funded by the corporation that oversees the urban voluntary school transfer program. Section 162.1060.3(2). The districts argue that applying § 167.131 to the City of St. Louis would siphon resources away from the city's schools and thereby undermine one of the purposes of SB 781, which was to provide additional resources to the city district.[6] Second, the districts argue that applying § 167.131 to the City of St. Louis will destabilize the urban voluntary school transfer program. They argue the transfer program will be destabilized because participating St. Louis County school dis-

---

**4.** Sections 162.1060 and 162.1100 were both provisions contained in SB 781 and went into effect after the St. Louis desegregation case was settled.

**5.** The policy considerations and mandates regarding public schools and public school funding are particularly well-suited for the state legislature and not the courts. For that reason, this Court will adhere to the express language of the statutes and not make an assumption that the legislature did not intend § 167.131 to apply to the St. Louis City school district. It could have easily done so when it enacted the legislation to enforce the desegregation of the St. Louis city schools.

**6.** The school districts ignore the fact that a reduction in district resources inevitably results even when a transfer occurs pursuant to the urban voluntary transfer program because, under § 162.1060.3(2), the state and federal aid that otherwise would be paid to a student's district of residence is paid to the transfer corporation, which in turn transfers the funds to the school district the student attends.

tricts would be likely to discontinue participation in the program to accommodate the increasing number of city students choosing to transfer to county schools under § 167.131. As a result, the districts argue that the remedial purpose of § 162.1060—to desegregate the city's schools—would be undermined.

The school districts also argue that § 162.1100, as contained in SB 781, conflicts with § 167.131. That provision directs how the St. Louis public school district is governed in the event that it loses state accreditation. Under § 162.1100.2(2), the governor is required to appoint a chief executive, who assumes all of the powers and duties of a general superintendent. After appointment of the chief executive, control of the district is taken away from the existing school board and is vested in a special administrative board. Section 162.1100.3. The special administrative board and the chief executive are responsible for taking broad actions aimed at restoring the city school district to accredited status. Section 162.1100.4(1)-(5). The districts argue that applying § 167.131 to the City of St. Louis would cause an exodus of students from St. Louis city schools to St. Louis County schools. In turn, the districts argue that the decreased enrollment in city schools would cause a large reduction in the city district's state funding, thereby undermining the ability of the special administrative board to meet its statutory obligation of restoring the city district to accredited status.[7]

Despite their predictions about the effect of decreased funding on the St. Louis public school district, the school districts have failed to show that the legislature, by its enactment of SB 781, intended to exclude the city district from the application of § 167.131. As noted earlier, there is nothing in the language of SB 781 expressly exempting the transitional school district from the application of § 167.131, nor are there any textual inconsistencies that exist between the statutes that preclude the provisions of SB 781 and § 167.131 from operating concurrently. The school districts essentially ask this Court to find that SB 781 effectuated an implied partial repeal of § 167.131.

However, repeals by implication are disfavored. *StopAquila.org v. City of Peculiar*, 208 S.W.3d 895, 905 n. 14 (Mo. banc 2006). "If by any fair interpretation both statutes may stand, there is no repeal by implication and both statutes must be given their effect." *Silcox v. Silcox*, 6 S.W.3d 899, 903 (Mo. banc 1999). When two provisions are not irreconcilably inconsistent, both must stand even if "some tension" exists between them. *StopAquila.org*, 208 S.W.3d at 905. At most, SB 781 and § 167.131 are in tension with one another in that applying § 167.131 to the transitional school district makes the implementation of SB 781 more difficult. That alone is an insufficient basis for finding that the legislature intended to impliedly repeal the application of § 167.131 to the City of St. Louis.

This Court enforces statutes as they are written, not as they might have been written. *City of Wellston v. SBC Commc'ns, Inc.*, 203 S.W.3d 189, 192 (Mo. banc 2006). It is presumed that the General Assembly legislates with knowledge of existing laws. *State ex rel. Broadway–Washington Assocs., Ltd. v. Manners*, 186

---

**7.** There is no factual information contained in this record to support this speculative claim, and this Court refuses to go outside the record below to decide this case. Neither will this Court speculate that a sufficient number of city students would choose any particular new district to make their attendance impossible. The dissent seeks to support this claim by taking judicial notice of census information and thereafter makes assumptions of fact.

S.W.3d 272, 275 (Mo. banc 2006). Consequently, the Court must assume that the legislature was aware of § 167.131 when it enacted SB 781. If the legislature had intended to exclude the application of § 167.131 to the transitional school district when it enacted SB 781, it easily could have added such an exception.[8] It did not.

■ Accordingly, the Court cannot supply what the legislature has omitted from controlling statutes. *State ex rel. Mercantile Nat. Bank at Dallas v. Rooney*, 402 S.W.2d 354, 362 (Mo. banc 1966); *Bd. of Educ. of City of St. Louis v. State*, 47 S.W.3d 366, 371 (Mo. banc 2001) ("courts cannot transcend the limits of their constitutional powers and engage in judicial legislation supplying omissions and remedying defects in matters delegated to a coordinate branch of our tripartite government"). Moreover, it is not within the Court's province to "question the wisdom, social desirability, or economic policy underlying a statute as these are matters for the legislature's determination." *Winston v. Reorganized Sch. Dist. R–2, Lawrence County, Miller*, 636 S.W.2d 324, 327 (Mo. banc 1982). The Court must enforce the law as it is written, which in the present case means that SB 781 applies concurrently with § 167.131.

### Clayton School District is Required to Admit Students Pursuant to § 167.131

■ Clayton school district additionally argues that admission of students pursuant to § 167.131 is discretionary despite the mandatory language of the statute. Clayton school district asserts that § 167.020 gives a school district discretion

whether to admit students under § 167.131.

This argument is based on language in § 167.020 that a student must obtain a waiver of the residency requirement. Section 167.020 is a general statute and makes no mention of § 167.131. The school district argues that they must be read *in pari materia* and harmonized.

■ The school district and the dissent would have this Court harmonize the statutes by making "shall" in § 167.131 a "may." That was an option for the legislature. This Court determines the proper declaration is to recognize that § 167.131 was enacted to cover the factual scenario of this case and § 167.020 is a general statute. The doctrine of *in pari materia* recognizes that statutes relating to the same subject matter should be read together, but where one statute deals with the subject in general terms and the other deals in a specific way, to the extent they conflict, the specific statute prevails over the general statute. *Parktown Imports, Inc. v. Audi of America, Inc.*, 278 S.W.3d 670, 673 n. 2 (Mo. banc 2009).

[T]he rules of statutory interpretation are not intended to be applied haphazardly or indiscriminately to achieve a desired result. Instead, the canons of statutory interpretation are considerations made in a genuine effort to determine what the legislature intended. This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue.

*Id.* at 672.

■ In this case, this Court need not look to § 167.020 because there is no

---

8. In fact, there are two instances in § 162.1100 in which the legislature expressly exempted the transitional school district from the operation of other statutes. For example, the transitional school district is not subject to any certificate of tax abatement issued pursuant to §§ 99.700 to 99.715. Section 162.1100.5. Additionally, the district is not subject to the provisions of §§ 162.081, 163.021 or 163.023 with respect to any requirements to maintain a minimum value of operating levy. *Id.*

need to refer to other similar statutes where a statute's own language is clear. *Home Builders Ass'n of Greater St. Louis, Inc. v. City of Wildwood,* 107 S.W.3d 235, 239 (Mo. banc 2003). Or, in other words, this Court does not apply the canons of interpretation or seek aides to interpret a statute when a statute is easily read and understood.[9] *See, e.g., Ins. Co. of State of PA v. Dir. of Revenue and Dir. of Ins.,* 269 S.W.3d 32, 34 n. 5 (Mo. banc 2008) (There is no need to resort to statutory interpretation when a statute is unambiguous.); *Hyde Park Housing P'ship v. Dir. of Revenue,* 850 S.W.2d 82, 84 (Mo. banc 1993) ("Where the language is clear and unambiguous, there is no room for construction."); *Abrams v. Ohio Pac. Exp.,* 819 S.W.2d 338, 340 (Mo. banc 1991) (internal citations omitted) ("There is no room for construction where words are plain and admit to but one meaning ... [w]here no ambiguity exists, there is no need to resort to rules of construction.").

The plain and ordinary meaning of the language in § 167.131.2 that "each pupil shall be free to attend the public school of his or her choice" gives a student the choice of an accredited school to attend, so long as that school is in another district in the same or an adjoining county, and requires the chosen school to accept the pupil. This interpretation is confirmed by the fact that § 167.131.2 was amended to remove the discretion previously given to the student's chosen school. The prior version of § 167.131.2 provided "but no school shall be required to admit any pupil." Section 167.131.2, RSMo 1986. The legislature removed this language specifically taking away any discretion of the receiving school to deny admission under

the circumstances of this case. *See Cox v. Dir. of Revenue,* 98 S.W.3d 548, 550 (Mo. banc 2003) ("[w]hen the legislature amends a statute, that amendment is presumed to change the existing law."). Therefore, § 167.131.2 does not give an accredited school chosen by a student discretion to deny admission to that student.

The dissent comes to the wrong conclusion because it starts with a false premise. Rather than analyzing the statute enacted by the legislature to specifically govern the particular situation when a school loses its accreditation, the dissent falsely assumes that a later enacted general statute governs over a previously enacted specific statute. In doing so, the dissent, with a particular result in mind, restates the issue assuming § 167.020 controls the issue of whether the Clayton school district has discretion to admit students from unaccredited schools seeking admission pursuant to § 167.131.

### Children's Admissions Were Under Tuition Agreements

■ The parents argue that the tuition agreements should be terminated for lack of consideration and contend that they have a right to restitution because they are now paying tuition for an education their children should have received for free under § 167.131. The contracts did not fail for lack of consideration, and the parents are not entitled to restitution.

The parents obtained the admission of their children to the Clayton school district pursuant to § 167.151.1 by entering into personal tuition agreements in which the parents agreed to pay their children's tu-

---

For the same reason, this Court need not look to the Department of Elementary and Secondary Education's interpretation of § 167.131 as the dissent does. Courts do not look to agency interpretations when a statute

is unambiguous. *Blue Springs Bowl v. Spradling,* 551 S.W.2d 596, 599–600 (Mo. banc 1977). Moreover, the DESE interpretation cites no legal authority and has not been subjected to the rulemaking process.

ition. Under the terms of those agreements, the Clayton school district was only obligated to allow the children to attend so long as *the parents* paid the children's tuition. By arguing that the Clayton school district is now required to seek payment from the transitional school district and that the parents are entitled to restitution for tuition previously paid to the Clayton school district, the parents are attempting to bind the district beyond the terms of their tuition agreements.

 An unambiguous contract must be enforced according to its terms. *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). In the present case, the parents contractually obligated themselves to pay the children's tuition in return for the Clayton school district's promise to allow the students to enroll during the time period governed by the agreements. There was no contingency in the agreement that provided the parents were no longer required to pay the children's tuition if the St. Louis public school district lost accreditation. Therefore, the Clayton school district is not obligated to seek payment from the transitional school district for the school years governed by the tuition agreements.

 Further, there has been no failure of consideration. "[C]onsideration must be measured at the time the parties enter into their contract and [ ] the diminished value of the economic benefit conferred, or even a complete lack of value, does not result in a failure of consideration." *Weinstein v. KLT Telecom, Inc.*, 225 S.W.3d 413, 415–16 (Mo. banc 2007); *see also Union Pac. R. Co. v. Kansas City Transit Co.*, 401 S.W.2d 528, 536 (Mo.App.1966) (citations omitted) ("If the promisor gets what he bargains for there is no failure of consideration, although what he receives becomes less valuable or of no value at all"). Here, the parents received the benefit of their bargain—the education of their children by the Clayton school district—and, therefore, cannot claim lack of consideration.

## Conclusion

For the foregoing reasons, the trial court's judgment is reversed, and this case is remanded.

PRICE, C.J., TEITELMAN, WOLFF and FISCHER, JJ., concur.

BRECKENRIDGE, J., concurs in part and dissents in part in separate opinion filed.

RUSSELL and STITH, JJ., concur in opinion of BRECKENRIDGE, J.

PATRICIA BRECKENRIDGE, Judge, concurring in part and dissenting in part.

I concur with the majority opinion's conclusion that section 167.131 [1] applies to the transitional school district for the City of St. Louis. I further agree that the parents are required to pay their children's tuition for any school years covered by their tuition agreements and that the parents are not entitled to restitution of the tuition paid under those agreements. However, I disagree with the majority opinion's conclusion that section 167.131 compels the Clayton school district to admit the children and, instead, believe that section 167.020 gives the Clayton school district discretion in admitting the children. I would affirm the trial court's judgment in favor of the Clayton school district.

The majority opinion holds that the plain and ordinary language in section

---

1. All statutory references to section 167.131 are to RSMo 2000. Unless otherwise noted, all remaining statutory references are to RSMo Supp.2009.

167.131.2 stating that "each pupil shall be free to attend the public school of his or her choice" gives the pupil the unfettered choice to attend an accredited school in an adjoining district and requires the chosen school to accept the pupil. The majority opinion reaches its conclusion by reading the language that gives the pupil a choice of school in isolation rather than by reading such language in the context of section 167.131 as a whole. As addressed below, when the choice-of-school language is read in context, there are limitations imposed on the pupil's choice.

Additionally, because the majority opinion considers the language in section 167.131 to be clear, it questions whether the Court even should consider section 167.020 when interpreting section 167.131. Even assuming *arguendo* that the language in section 167.131.2 clearly requires a school to admit pupils seeking admission pursuant 167.131, it nevertheless remains that when "two statutory provisions covering the same subject matter are unambiguous standing separately but are in conflict when examined together, [this Court] must attempt to harmonize them and give them both effect." *S. Metro. Fire Prot. Dist. v. City of Lee's Summit,* 278 S.W.3d 659, 666 (Mo. banc 2009). As discussed below, the majority's interpretation of section 167.131 brings the statute into conflict with section 167.020 and, therefore, the Court must attempt to harmonize the two provisions.

Section 167.020 was adopted by the General Assembly in 1996 as part of a bill commonly known as the "Safe Schools Act." [2] 1996 Mo. Legis. Serv. H.B. Nos. 1301 & 1298. Section 167.020 comprehensively governs when pupils can register to attend school in a district. Section 167.020 establishes the circumstances under which a district is compelled to admit a pupil and when a district's school board has discretion whether to admit a nonresident pupil. Section 167.020.3, .6.

Section 167.020 reads, in relevant part:

2. In order to register a pupil, the parents or legal guardian of the pupil or the pupil himself or herself shall provide, at the time of registration, one of the following:

(1) Proof of residency in the district. . . .; or

(2) Proof that the person registering the student has requested a waiver under subsection 3 of this section within the last forty-five days. . . .

3. Any person subject to the requirements of subsection 2 of this section may request a waiver from the district board of any of those requirements on the basis of hardship or good cause. . . . [T]he board shall convene a hearing as soon as possible, but no later than forty-five days after receipt of the waiver request made under this subsection or the waiver request shall be granted. The district board or committee of the board may grant the request for a waiver of any requirement of subsection 2 of

---

**2.** The Safe Schools Act was passed the year after a freshman girl at McCluer North High School in St. Louis County was raped and murdered in the school restroom by a pupil who had transferred to her school the day before because he had been suspended from another school. Susan Anderson, THE SAFE SCHOOLS ACT PROTECTS MISSOURI STUDENTS, 55 J. Mo. B. 264 (1999); Stanley M. Burgess, MISSOURI'S SAFE SCHOOLS ACT: AN ATTEMPT TO ENSURE A SAFE EDUCATION OPPORTUNITY, 66 UMKC L.Rev.

603 (1998). The Safe Schools Act gives a school district access to information about a nonresident pupil who seeks admission. Under the act, the district has the right to obtain records of the enrolling pupil, including discipline records, and convene a hearing "where there is reason to suspect that admission of the pupil will create an immediate danger to other pupils and employees of the district." Section 167.020.2(2), .7.

this section. The district board or committee of the board may also reject the request for a waiver in which case the pupil shall not be allowed to register. Any person aggrieved by a decision of a district board or committee of the board on a request for a waiver under this subsection may appeal such decision to the circuit court in the county where the school district is located.

\* \* \*

6. Subsection 2 of this section shall not apply to a pupil who is a homeless child or youth, or a pupil attending a school not in the pupil's district of residence as a participant in an interdistrict transfer program established under a court-ordered desegregation program, a pupil who is a ward of the state and has been placed in a residential care facility by state officials, a pupil who has been placed in a residential care facility due to a mental illness or developmental disability, a pupil attending a school *pursuant to sections 167.121 and 167.151*, a pupil placed in a residential facility by a juvenile court, a pupil with a disability identified under state eligibility criteria if the pupil is in the district for reasons other than accessing the district's educational program, or a pupil attending a regional or cooperative alternative education program or an alternative education program on a contractual basis. (emphasis added.)

To register for classes under the Safe Schools Act, a pupil must show that he or she is a resident of the district to be attended, has requested a waiver of the residency requirement, or is exempt from the residency and waiver requirements. Section 167.020.2, .6. When a nonresident pupil requests a waiver, the district *"may grant the request for a waiver of any requirement of subsection 2 . . . ."* or *"may also reject the request for a waiver in* which case the pupil shall not be allowed to register." Section 167.020.3 (emphasis added). Because the statute uses the word "may" rather than "shall" when referring to the grant or denial of a waiver, the district is not under a mandatory obligation to grant a waiver to allow a pupil to register. *See State ex inf. McKittrick v. Wymore*, 343 Mo. 98, 119 S.W.2d 941, 944 (1938) ("It is the general rule that in statutes the word 'may' is permissive only, and the word 'shall' is mandatory."). However, section 167.020.3 provides for judicial review of a district's decision to deny a waiver, so a district's discretion is limited.

Subsection 6 of section 167.020 exempts certain pupils from the residency or waiver requirements of subsection 2. Included in the exemptions are pupils attending school pursuant to section 167.121, a statute permitting transfer of pupils for transportation hardships, and section 167.151, a statute allowing admittance of nonresident tuition-paying pupils. Section 167.020.6. While pupils attending under sections 167.121 and 167.151 are exempt from the waiver requirement, pupils attending under section 167.131 are not.

The majority opinion implies that because section 167.020 does not mention section 167.131 expressly, then section 167.020 has *no impact* on section 167.131. Contrary to the majority's assertion, examination of the statutes excluded from the waiver requirement of section 167.020 requires the conclusion that the legislature intended that non-resident pupils seeking admission under section 167.131 are subject to the waiver requirements of section 167.020.2(2). Like section 167.131, sections 167.121 and 167.151 govern situations in which pupils can attend schools outside of their district of residence. The legislature's inclusion of sections 167.121 and 167.151 in the list of exemptions in section 167.020.6 indicates that the legislature in-

tended to exclude section 167.131 so a pupil attending a school under that section would be required to obtain a waiver from the board. *See Harrison v. MFA Mut. Ins. Co.*, 607 S.W.2d 137, 146 (Mo. banc 1980) (" 'the express mention of one thing implies the exclusion of another' " (quoting *Brown v. Morris*, 365 Mo. 946, 290 S.W.2d 160, 166 (1956))).[3]

As discussed previously, section 167.020.3 vests a school with discretion whether to grant a waiver to nonresident pupils who are not exempt from the waiver requirements under the Safe Schools Act. Section 167.020.6 does not exempt pupils seeking admission under section 167.131 from the waiver requirements in section 167.020.3. Consequently, because a waiver is required, a school district, like Clayton, has discretion pursuant to section 167.020 in deciding whether to admit a pupil seeking admission under section 167.131. The majority's interpretation of section 167.131 conflicts with this plain reading of section 167.020; therefore, an attempt must be made to harmonize the two provisions. *S. Metro. Fire Prot. Dist.*, 278 S.W.3d at 666.

The two statutes can be harmonized by simply reading the last sentence in section 167.131.2 in its entirety and giving effect to every word. The final sentence of 167.131.2 states: "Subject to the limitations of this section, each pupil shall be free to attend the public school of his or her choice." As noted above, this is the same provision the majority interprets as mandating an accredited district to accept any pupil from an unaccredited district who applies to the accredited district. The

majority's interpretation of subsection 2 of section 167.131, however, focuses only on the language "each pupil shall be free to attend the public school of his or her choice" and gives no effect to the legislature's limitation of the pupil's choice by its inclusion of the phrase "[s]ubject to the limitations of this section." " 'It is presumed that the legislature intended that every word, clause, sentence, and provision of a statute have effect.' " *State ex rel. Unnerstall v. Berkemeyer*, 298 S.W.3d 513, 520 (Mo. banc 2009) (quoting *Hyde Park Hous. P'ship v. Dir. Of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993)). "Conversely, it will be presumed that the legislature did not insert verbiage or superfluous language in a statute." *Id.*

A limitation on a pupil's choice of schools is found in subsection 1 of section 167.131, which provides that the board of education of a district that does not maintain an accredited school shall pay the tuition of and provide transportation for "each pupil resident therein who *attends* an accredited school in another district of the same or an adjoining county." (emphasis added). Section 167.131, read in its entirety, provides that while each pupil is free to choose the school the pupil desires to attend, that choice is limited by the requirement that the pupil be admitted to and attend the school of the pupil's choice. Therefore, it is necessary to look to other provisions governing the admission of nonresident pupils, which would include section 167.020.

As discussed above, section 167.020 grants receiving schools discretion in

---

**3.** In light of section 167.020's purpose of promoting safe schools, the legislature may have limited its exemptions from waivers in subsection 6 to pupils who are required to go through a screening process to be accepted in a program, such as the interdistrict transfer program, or pupils given permission to attend school in another district by the state board of

education under section 167.121, and those currently being supervised and monitored by another government entity, such as "a pupil who is a ward of the state and has been placed in a residential care facility by state officials." Pupils who seek to attend under section 167.131 fit in neither of these two categories.

granting enrollment waivers to nonresident pupils seeking admission pursuant to section 167.131. Therefore, reading section 167.131 *in pari materia* with section 167.020 reveals the legislature's intention that, while a pupil "shall be free to attend the public school of his or her choice," that choice is subject to the limitation that the pupil be admitted properly to the receiving school, which includes obtaining a discretionary waiver from the receiving school district pursuant to section 167.020.

To the extent that the majority opinion relies on the legislature's removal of the language in section 167.131.2—"but no school shall be required to admit any pupil"—to support its conclusion that a chosen school lacks discretion to deny admission to pupils from unaccredited districts, that fact does not change the interpretation above. Although the legislature may have intended to limit a school district's discretion to admit students applying under section 167.131 in 1993 when it deleted the aforementioned language its subsequent enactment in 1996 of section 167.020.3 as part of the Safe Schools Act changed that result. Section 167.020 makes clear the legislature intended for school districts to have discretion in granting waivers to allow non-resident students to register and attend school.

In reaching its conclusion that section 167.131 requires the Clayton school district to accept students from the transitional school district, the majority opinion relies on the rule of construction that a more specific statute governs over a more general statute to the extent of any inconsistency between the two. However, that rule of construction traditionally applies only in situations in which the two statutory provisions being construed cannot be harmonized. *See S. Metro. Fire Prot. Dist.*, 278 S.W.3d at 666 (rule applies "[i]f harmonization is impossible"); *see also*

*Greenbriar Hills Country Club v. Dir. of Revenue,* 47 S.W.3d 346, 352 (Mo. banc 2001) ("rule applies only in situations where there is a 'necessary repugnancy' between the statutes." (quoting *State ex rel. City of Springfield v. Smith,* 344 Mo. 150, 125 S.W.2d 883, 885 (1939))); *State ex rel. Dir. of Revenue v. Gaertner,* 32 S.W.3d 564, 566 (Mo. banc 2000) (before applying the rule, the two statutes "should be harmonized if possible"). Because sections 167.020 and 167.131 can be harmonized, as noted above, the majority opinion's use of that rule is misplaced.

This interpretation is also consistent with Department of Elementary and Secondary Education's (DESE), interpretation that school districts have discretion whether to admit pupils residing in unaccredited schools under section 167.131. Shortly before the St. Louis school district officially lost its accredited status, DESE released a public statement regarding the effect of a school district's loss of accreditation. In the public statement, DESE stated that "Accredited districts . . . may accept or reject transfer pupils from an unaccredited district." Additionally, DESE drafted an earlier memorandum regarding the responsibilities of an unaccredited school under section 167.131. The memorandum stated:

> Historically, the department's position has been that students may be accepted by an accredited school district on a "space available" basis. An accredited school cannot be compelled to accept students from an unaccredited district since local boards of education have discretion to admit or to not admit tuition-paying students.

DESE's construction of section 167.131 is entitled to "great weight" because it is the agency charged with administering the educational laws of this state that pertain to elementary and secondary education. *See*

*Linton v. Mo. Veterinary Med. Bd.*, 988 S.W.2d 513, 517 (Mo. banc 1999).

Finally, this opinion's interpretation avoids the absurd consequences that would result if the majority's interpretation of section 167.131 prevails. To interpret section 167.131 as placing a mandatory obligation on the Clayton school district to accept all pupils from the City of St. Louis who apply for admission would mean there is no limit to the potential influx of pupils that Clayton or any other school district in St. Louis County could face. Under the majority's interpretation of the relevant statutory provisions, school districts in St. Louis County would be required to accept pupils from the transitional school district even if the number of pupils seeking admittance exceeded their capacity or if St. Louis County school districts have difficulty collecting tuition payments from the transitional school district.[4]

To illustrate the point, taking judicial notice of the 2000 census as authorized by section 490.700, RSMo 2000, the City of St. Louis had a population of 89,657 people who were under the age of 18 years, with 23,477 of those people being under the age of 5.[5] Accordingly, in 2000, the City of St. Louis had approximately 66,180 school-aged pupils who were entitled to attend the city's school district. In contrast, Clayton had a population of 2,584 people who were under the age of 18, with 490 of those people being under the age of 5.[6] Therefore, in 2000, Clayton had approximately 2,094[7] school-aged people entitled to attend the Clayton school district.[8] Under the majority opinion's interpretation of section 167.131, even if only 3 percent of the approximately 66,000 school-aged pupils living in the City of St. Louis applied for enrollment in the Clayton school district, the district would be required to accept all of those students, despite the fact that it would cause nearly a 100–percent increase in its enrollment. Such an increase would require the Clayton school district, virtually overnight, to acquire new classroom buildings and hire numerous additional faculty members to meet the increased demands on the district. Such a result is absurd. This Court "presumes the legislature did not intend to enact an absurd law and favors a construction that avoids unjust or unreasonable results." *Care and Treatment of Schottel v. State,* 159 S.W.3d 836, 842 (Mo. banc

4. One of the reasons given by the Clayton school board for its decision not to admit the parents' children was that it previously had admitted pupils from the Wellston school district when that district became unaccredited and the Clayton district had difficulty collecting tuition payments.

5. U.S. CENSUS BUREAU, http://factfinder.census.gov/home/saff/main.html (enter "St. Louis" in Fast Access to Information search engine; then click "GO"; then select "St. Louis city, Missouri" hyperlink; then click "2000" tab) (last visited July 6, 2010).

6. U.S. CENSUS BUREAU, http://factfinder.census.gov/home/saff/main.html (enter "Clayton" in Fast Access to Information search bar; then select "Missouri" from drop-down menu; then click "GO.") (last visited July 6, 2010).

7. The validity of using the 2000 census figure is supported by a comparison of such figure with the Clayton school district's average daily attendance figures during the 2001–2002 school year. The average daily attendance for Clayton during 2001–2002 was approximately 2,314, while the census figure shows approximately 2,094 school-aged pupils residing in the Clayton school district in 2000.

8. Admittedly the census figures have changed since the 2000 census; however, any changes in the population density of the two cities will not impact the enormous disparity between the two school districts and the potential for an unmanageable number of pupils seeking admission to Clayton schools.

2005).[9]

## Conclusion

In summary, the language in section 167.131 providing that each pupil who resides in an unaccredited school district is free to attend the public school of his or her choice is subject to the limitations of that section. Subsection 1 of 167.131 includes a limitation in that it requires the unaccredited school district to pay tuition only for "each pupil resident who *attends* an accredited school in another district of the same or an adjoining county." Section 167.020 governs the admittance of nonresident pupils by a school district and gives the district's school board discretion whether to grant an enrollment waiver to any nonresident pupil who is not subject to one of the exemptions in subsection 6. Reading section 167.131 in its entirety and in harmony with section 167.020, a pupil who resides in an unaccredited school district can attend an accredited school in another district of an adjoining county and have the pupil's tuition paid, as required by 167.131.1, only if the pupil has been admitted by the accredited school district and, unless the pupil qualifies for one of the exemptions in 167.020.6, the accredited school district has discretion whether to admit the nonresident pupil. Because the plaintiffs' children did not qualify for one of the exemptions in section 167.020.6 and section 167.020.3 gives the Clayton school district board the discretion to decide not to admit the children, I respectfully disagree with the majority's holding that Clayton is obligated to admit the plaintiffs' children.[10] Accordingly, I would affirm the trial court's judgment in favor of the Clayton school district.

---

**9.** The majority opinion criticizes the fact that this opinion takes judicial notice of the 2000 census data. Judicial notice of the census data is taken only to illustrate the grievous consequences that may result if the majority's interpretation were followed. Those facts are not essential to the ultimate conclusion reached in this opinion. Additionally, this Court, on multiple occasions, has taken judicial notice of facts on appeal when the facts were not part of the record on appeal. *See Union Elec. Co. v. City of Crestwood,* 499 S.W.2d 480, 483 n. 3 (Mo.1973); *see also*

*Lazare v. Hoffman,* 444 S.W.2d 446, 449 (Mo. 1969).

**10.** Of course, as the majority opinion notes, this is a reversal of summary judgment in favor of the Clayton and transitional school districts and not a final resolution of the case. On remand, the parties are free to seek leave to amend their pleadings, to offer additional proof on relevant issues, including impossibility to comply with section 167.131, or to take such additional action as may be appropriate.