IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 EQUITY FINANCIAL )
 RESOURCES, INC., )
 Respondent, )
 )
 v. ) WD83461
 )
 HOWARD OVERMAN, et al., ) FILED: March 16, 2021
 Appellants. )
 Appeal from the Circuit Court of Clay County
 The Honorable Janet L. Sutton, Judge
 Before Division One: Alok Ahuja, P.J., and
 Thomas H. Newton and Thomas N. Chapman, JJ.
 Equity Financial Resources, Inc., brought suit against Rose Ann, Howard,

Tracy, and Taylor Overman, to enforce an agreement in which the Overmans agreed

to pay Equity a commission for procuring financing for their agricultural business.

Following a jury trial, the Circuit Court of Clay County entered judgment for
Equity. The Overmans appeal. They argue that the circuit court’s verdict-directing

instruction was erroneous, because it failed to require the jury to resolve a critical

disputed factual issue, and that the circuit court abused its discretion by refusing to

submit an instruction on the affirmative defense of failure of consideration.

Because we agree that the verdict-directing instruction was deficient, we reverse

and remand for a new trial.
 Factual Background
 Together with her husband Rodney (who passed away in July 2016), Rose

Ann Overman farmed land in Barton County beginning in 1960.1 Although they

began by purchasing an 80-acre tract, the farmland the Overmans owned grew to

1,579 acres by 2017. In 2017, all of the land was titled in the name of Overman and

Son Partnership, a partnership comprised of Rose Ann; her son, Howard; Howard’s

wife, Tracy; and Rose Ann’s grandson, Taylor.

 The Overmans borrowed extensively to finance their property acquisitions

and farming operations. By the end of 2016, the Overmans owed Simmons Bank

$4.3 million on a promissory note, and an additional $500,000 on a line of credit, all

secured by their farmland. They also owed $500,000 to Deere & Company, secured

by some of their farm equipment.

 The Overmans wished to refinance their debt, but were unsuccessful in

locating alternate financing on their own. In April 2017, they contacted Gail

Murphy, President of Equity, for assistance in locating replacement financing.

 Equity and the Overmans entered into two agreements in April 2017. Under

the first agreement, the Overmans agreed to pay Equity an hourly rate to prepare a

business plan to present to potential lenders. Pursuant to this agreement, Equity
developed a plan which proposed that the Overmans refinance their existing debt

with two new loans at a 5% interest rate: a twenty-year loan for $4,680,310; and a

seven-year loan for $700,000. The Overmans paid Equity $7,500 for development of

the business plan.

 The second agreement required Equity to use its best efforts to assist

Overman and Son Partnership in obtaining financing. Equity was to be paid a 1%

 1 Because she shares a surname with other parties to this proceeding, we refer
to Rose Ann Overman by her first name for clarity’s sake. No familiarity or disrespect is
intended.

 2
commission upon closing of a new loan. The agreement contained a provision giving

Equity the exclusive right to seek financing for the Overmans for one year, and

specifying that the Overmans would owe Equity a commission if they independently

obtained financing. The exclusivity provision stated:

 APPLICANT agrees that EQUITY shall have the EXCLUSIVE right
 for the period of 365 days from the date of this agreement to attempt to
 arrange financing for APPLICANT with a bank, lender, or other
 financial resource upon terms and conditions suitable to the
 APPLICANT. . . . During this EXCLUSIVE time period, APPLICANT
 agrees not to attempt to arrange financing on their own without the
 express written consent of EQUITY. If the APPLICANT, without the
 assistance of EQUITY, obtains financing from a suitable bank, lender,
 or other financial resource during this EXCLUSIVE time period,
 APPLICANT agrees to compensate EQUITY as set forth [elsewhere in
 the agreement].
 Following execution of the commission agreement, Murphy began working to

secure financing for the Overmans. Murphy also communicated with the

Overmans’ existing lenders, Simmons Bank and Deere & Company, to forestall

foreclosure on their farmland and repossession of their equipment.

 Murphy was unable to secure replacement financing during 2017. In late

November or early December 2017, Deere & Company repossessed some of the

Overmans’ equipment. Rose Ann testified at trial that Simmons Bank also
advertised a foreclosure sale for the Overmans’ property for January 4, 2018.

 Because Equity had not secured financing, Rose Ann contacted Conterra

Bank in Iowa. Conterra agreed to issue the Overmans a three-year “bridge loan” of

approximately $5.43 million, at an annual interest rate of 8.08%. Rose Ann

testified that the proceeds of the Conterra loan fell approximately $120,000 short of

what the Overmans needed to respond to the existing collection efforts, which

required them to sell a tractor to pay what was due to Deere & Company and regain

possession of their other farm equipment. The proceeds of the Conterra loan were

 3
disbursed on January 3, 2018 – the day before Simmons Bank’s foreclosure sale was

scheduled to occur.

 When Murphy heard that the Overmans had secured financing from

Conterra, he demanded that they pay Equity its 1% commission on the loan

amount. The Overmans refused. In February 2018, Equity filed this lawsuit in the

Circuit Court of Clay County (the forum specified in the loan commission

agreement), asserting claims for breach of contract and quantum meruit.

 A jury trial was held in September 2019. Equity submitted only its claim of

breach of contract. The jury found in Equity’s favor, and awarded it $54,300, 1% of

the principal amount of the Conterra loan. The circuit court’s judgment also

awarded Equity $26,685.84 in attorney’s fees, and pre-judgment interest in the

amount of $8,220.87.

 The Overmans appeal.2

 Discussion
 I.
 The Overmans’ first Point argues that the verdict-directing instruction for

Equity’s breach of contract claim (Instruction No. 6) failed to require the jury to

decide a disputed factual issue. As submitted, Instruction No. 6 read:
 Your verdict must be for plaintiff if you believe
 First, plaintiff and defendants entered into an agreement
 whereby plaintiff agreed to use its best efforts to obtain financing for
 defendants and defendants agreed to pay plaintiff 1% of any
 financing obtained by defendants during the term of the
 contract, and
 Second, plaintiff performed its agreement, and
 Third, defendants failed to perform their agreement, and

 2 Rose Ann Overman died in October 2020, after the filing of this appeal.
Because no motion for substitution was filed within ninety days of her passing, we
dismissed Rose Ann from this appeal without prejudice.

 4
 Fourth, plaintiff was thereby damaged.
(Emphasis added.) The Overmans argue that the emphasized portion of paragraph

“First” was erroneous because it did not require the jury to decide an essential,

disputed issue: whether the financing Rose Ann obtained from Conterra was

“suitable.” We agree.

 The Overmans preserved the issue raised in their first Point by making a

specific objection to the verdict director during the on-the-record instruction

conference, and by re-asserting that objection in their timely-filed new-trial motion.

 “Whether a jury was properly instructed is a question of law that this Court

reviews de novo.” Edgerton v. Morrison, 280 S.W.3d 62, 65 (Mo. 2009) (citation

omitted). To reverse on grounds of instructional error, the party claiming

instructional error must establish (1) that the instruction at issue misdirected,

mislead, or confused the jury; and (2) prejudice resulted from the instructional

error. Sorrell v. Norfolk S. Ry. Co., 249 S.W.3d 207, 209 (Mo. 2008).

 “Where a dispute exists as to one or more of the terms of the agreement relied

on by the claimant to support recovery, that issue must be hypothesized in the

verdict directing instruction. Failure to do so is prejudicial error.” Penberthy v.

Nancy Transp., Inc., 804 S.W.2d 404, 407 (Mo. App. E.D. 1991) (citations and
internal quotation marks omitted). “Because ‘[t]he purpose of the verdict[ ]

directing instruction is to hypothesize propositions of fact to be found or rejected by

the jury,’ the verdict directing instruction ‘must hypothesize the facts essential to

the plaintiff's claim.’” Hervey v. Mo. Dep't of Corr., 379 S.W.3d 156, 160 (Mo. 2012)

(quoting Lasky v. Union Elec. Co., 936 S.W.2d 797, 800 (Mo. 1997); first alteration

added by Hervey).

 Equity was only entitled to a commission if the Overmans independently

obtained “suitable” financing. The parties’ agreement provided that Equity would
endeavor to secure financing for the Overmans “upon terms and conditions suitable

 5
to” them; the agreement also provided that the Overmans would owe Equity a

commission only if they independently secured financing “from a suitable bank,

lender, or other financial resource.”3

 The agreement does not further define what would be deemed “suitable” loan

terms, or a “suitable” lender. “To ascertain the original intent of the parties to a

contract, we will give the words of the contract their natural, ordinary, and common

sense meaning,” and may refer to a dictionary to supply that commonly understood

meaning. Behrick v. Konert Farms Homeowners’ Ass’n, 601 S.W.3d 567, 573 (Mo.

App. E.D. 2020) (citations and internal quotation marks omitted); see also, e.g., TCN

Invs., LLC v. Superior Detail, 588 S.W.3d 245, 251 (Mo. App. W.D. 2019). Common

dictionary definitions of the term “suitable” are: “adapted to a use or purpose,”4 or

“such as to suit; appropriate; fitting; becoming.”5

 The Overmans’ briefing suggests that the term “suitable” in the contract

contains a latent ambiguity. We do not find the term to be ambiguous, since it has

a single, commonly understood meaning. Instead, the term is general, and required

the jury to make a case-specific factual determination whether the “suitability”

condition was satisfied by the Conterra loan. In a similar fashion, courts have

recognized that issues of “reasonableness” or “materiality” in contract disputes
present factual issues for jury determination. See, e.g., Guengerich v. Barker, 423

S.W.3d 331, 339 (Mo. App. S.D. 2014) (“The materiality of a breach [of contract] is a

 3 The commission agreement uses slightly different wording to define Equity’s
obligation to locate financing for the Overmans, and the Overmans’ obligation to
compensate Equity for financing they independently procured. Notwithstanding the
variation in wording, Equity acknowledged in its briefing, and at argument, that it would
only be entitled to a commission if the Overmans had secured “suitable” alternative
financing.
 4 Suitable, MERRIAM-WEBSTER, https://www.merriam-
webster.com/dictionary/suitable?src=search-dict-box (visited March 9, 2021).
 5 Suitable, DICTIONARY.COM, https://www.dictionary.com/browse/suitable?s=t
(visited March 9, 2021).

 6
question of fact.” (citations omitted)); G & J Holdings, LLC v. SM Props., LP, 391

S.W.3d 895, 903 (Mo. App. E.D. 2013) (same); Swartz v. Mann, 160 S.W.3d 411, 414

(Mo. App. W.D. 2005) (“Whether buyers exercise reasonable diligence in obtaining

financing pursuant to a contingent financing provision [in a real-estate purchase

contract] is a question of fact.” (citations omitted)); Venture Stores, Inc. v. Pac.

Beach Co., 980 S.W.2d 176, 183 (Mo. App. W.D. 1998) (“what is [a] ‘reasonable

[time] under the circumstances’ [for exercising a purchase option] is a question of

fact, rather than one of law”; collecting cases).

 The Overmans disputed at trial whether the Conterra financing was

“suitable.” The business plan which Equity developed proposed that, for the long-

term viability of the Overmans’ farming operation, they should obtain twenty-year

financing with a 5% interest rate, and a smaller seven-year loan at the same

interest rate. This business plan provides some evidence of the meaning the parties

ascribed to “suitable” financing. During her testimony, Rose Ann testified that the

Conterra loan, for three years at 8.8% interest, was “not a long-term loan,” and that

the high interest rate was not economically viable:

 We have until 2021 to get a bank. And right now, we're paying
 8.08 percent interest on the big loan with Conterra. . . .
 So we need to get a bank with a lower interest. We could make
 our payments if we get a lower interest and get our payments strung
 out, we can make it.
 And my son and my grandson – my grandson is in to doing a no-
 till and into cover crops and to lower the input costs and spray, and
 he's – he can make it work, but we just got to have a bank.
Rose Ann also testified that the Conterra loan was $120,000 short of what the

Overmans needed to fully pay off their debts to Simmons Bank and Deere &

Company, and that they had been forced to sell a tractor to make up the deficit.

 Notably, Equity’s President, Gail Murphy, acknowledged on cross-
examination that Rose Ann had merely been able to obtain “what they call a bridge

 7
loan.” He agreed that a “suitable” loan for the Overmans “would be one that would

loan them 5 million-plus on a 20-year loan.” When asked whether the Overmans

had “obtain[ed] a loan from a suitable bank,” Murphy responded, “In my opinion,

no.” Murphy testified that even a loan with a ten-year amortization was “not worth

a darn” for purposes of financing farming operations like the Overmans’.

 The Overmans’ counsel highlighted the suitability issue for the jury in his

closing argument:

 [I]f you look at paragraph D which says: . . . If the applicant,
 without the assistance of Equity obtains financing . . . from a suitable
 bank, lender, or other financial resource during this inclusive time
 period, then the applicant still owes that one percent.
 Now, did Rose Ann Overman get a loan from a suitable bank
 lending institution?
 ....
 . . . He said: I can give you a loan close to $5 million, 20 years,
 five percent. Another one, half-a-million dollars, seven years, five
 percent.
 What did she get? She got a three-year loan. She got a bridge
 loan for three years. I can't remember, it's either eight or nine percent.
 And she's going to have to come along and try to get another loan
 before 2021, or she's going to be back in the same place she was.
 Despite the Overmans’ evidence and arguments that the Conterra loan was
not “suitable,” Equity argues that “the suitability of the financing cannot really be

in dispute[,] . . . because the [Overmans] actually accepted the $5,430,000 financing.

. . . When [the Overmans] accepted the financing, they put all issues to bed as to

whether or not the financing suited their needs.” Equity essentially argues that, if

the Overmans obtained financing, that financing was – by definition – “suitable.”

We disagree. The commission agreement only required the Overmans to

compensate Equity if the Overmans independently “obtain[ed] financing from a

suitable bank, lender, or other financial resource.” Equity’s argument would
require the Overmans to compensate it in any case in which they “obtain[ed]

 8
financing” – eliminating the separate requirement that the financing be “suitable.”

“[C]ourts must construe a contract,” however, “so as not to render any terms

meaningless.” State ex rel. Greitens v. Am. Tobacco Co., 509 S.W.3d 726, 743 (Mo.

2017) (citing State ex rel. Riverside Pipeline Co. v. Pub. Serv. Comm’n, 215 S.W.3d

76, 84 (Mo. 2007)). We reject Equity’s contention that the Conterra loan was

necessarily “suitable” simply because the Overmans agreed to it as a stop-gap

measure to avoid imminent foreclosure.

 Equity concedes that, to establish its right to a commission on the Conterra

loan, it was required to prove that the Conterra loan was “suitable.” Although this

issue was central to Equity’s cause of action, and was disputed by the Overmans at

trial, the verdict director did not require the jury to determine whether the

Overmans independently obtained “suitable” financing. The fact that the

Overmans’ counsel was able to argue the issue in closing is no substitute for

language in the verdict director which would have required the jury to find that the

Conterra loan was “suitable” before returning a verdict in Equity’s favor.

 Argument by counsel is no substitute for proper direction from the trial
 court. Irrespective of any comments made during closing arguments
 (which are by definition argumentative), the jurors are required to
 follow only the directions and instructions given to them by the court.
 Reasonable jurors could obviously reject statements made by counsel
 when those statements were not supported by the verdict director
 given to them by the court. Therefore, . . . “[w]hile [counsel’s] closing
 argument . . . would have been helpful to the jury in understanding
 the applicable rule of law . . . it was not sufficient . . . to allow the jury
 to render an informed verdict.”
Agri Process Innovations, Inc. v. Envirotrol, Inc., 338 S.W.3d 381, 389-90 (Mo. App.

W.D. 2011) (citing and quoting Rice v. Bol, 116 S.W.3d 599, 611 (Mo. App. W.D.

2003)); see also Miller v. Norfolk S. Ry. Co., 591 S.W.3d 29, 41 (Mo. App. W.D. 2019)

(admission of governing statute into evidence, and discussion of governing law in

 9
counsel’s closing argument, were “[in]sufficient to cure the prejudice from” the

court's instructional error).

 Because it failed to require the jury to find that the Conterra loan was

“suitable,” the verdict director on Equity’s breach of contract claim was prejudicially

erroneous, and requires reversal and remand for a new trial.

 II.
 In their second Point, the Overmans argue that the circuit court abused its

discretion in refusing to submit an affirmative defense instruction which they

tendered. The Overmans’ proposed instruction asked the jury to find that there had

been a failure of consideration preventing enforcement of the commission

agreement. Although what we have said in § I above mandates reversal, we

address the Overmans’ second Point because the issue may recur on remand.

 The Overmans’ proffered failure-of-consideration instruction (Instruction A)

read:

 Your verdict must be for Defendants if you believe:
 First, Gail Murphy knew that Defendants were indebted to
 Simmons Bank and John Deere Company and that if the Defendants
 were unable to obtain a loan through the services of Plaintiff, that
 Simmons Bank would foreclose Defendants' property and John Deere
 Company would seize Defendant's farm equipment covered by its lien,
 and
 Second, Plaintiff was unable to obtain financing for Defendants
 which would have prevented the foreclosure of the Simmons Bank loan
 and the seizure of Defendant's farm equipment by John Deere
 Corporation, and
 Third, Defendants were forced to obtain a loan from other
 sources to prevent the foreclosure of the Simmons Bank loan and the
 seizure of Defendant's farm equipment by John Deere Corporation,
 and
 Fourth, Plaintiffs failure to obtain financing to prevent
 foreclosure of Defendant's property by Simmons Bank and failure to
 obtain financing to pay off John Deere Corporation resulted in a failure
 of consideration to pay any money to Plaintiff in the event that

 10
 Defendant's obtained financing from another source without the
 assistance of Plaintiff.
 The word "consideration" as used in this instruction means a
 benefit to the defendant, or a loss or detriment to the plaintiff.
 “When a party claims that the trial court erroneously refused to submit an

instruction to which she claims she was entitled, we review the trial court's refusal

to submit the instruction for abuse of discretion.” McCullough v. Commerce Bank,

349 S.W.3d 389, 396 (Mo. App. W.D. 2011) (citations and internal quotation marks

omitted). “The trial court abuses its discretion when its ruling is clearly against the

logic of the circumstances then before the trial court and is so unreasonable and

arbitrary that the ruling shocks the sense of justice and indicates a lack of careful

deliberate consideration.” Dodson v. Ferrara, 491 S.W.3d 542, 552 (Mo. 2016)

(citation omitted).

 The circuit court did not abuse its discretion in refusing to submit Instruction

A to the jury. The facts hypothesized in the Overmans’ proposed instruction did not

establish a failure of consideration, but instead would have established only that

Equity had failed to perform its contractual obligations – an issue which was

already addressed in the verdict director on Equity’s breach of contract claim.

 “‘Failure’ of consideration implies that consideration, once existing and

sufficient, had become worthless or ceased to exist, which distinguishes it from ‘lack’

of consideration.” Mobley v. Baker, 72 S.W.3d 251, 257 (Mo. App. W.D. 2002)

(citation omitted). Where, as here, the contracting parties exchange promises as

consideration for a contract, there is no “failure of consideration” simply because

one of the parties fails to provide the promised performance. In these

circumstances, the contracting party’s “promises, and not the performance thereof,

constituted the consideration for the [contract], and [the other party]’s remedy for

[the contracting party]’s alleged failure to perform its promises was an action for
breach of the agreement” – not cancellation of the agreement on the basis of “failure

 11
of consideration.” Shelton v. M & A Elec. Power Co-op., 451 S.W.2d 375, 379 (Mo.

App. 1970) (citations omitted).

 Missouri courts have consistently rejected “failure of consideration”

arguments like the one made by the Overmans here. In Turner v. Sch. Dist. of

Clayton, 318 S.W.3d 660 (Mo. 2010), parents of children in the City of St. Louis

Transitional School District chose to send their children to school in the Clayton

School District. Id. at 663. Because they lived outside the boundaries of the

Clayton district, the parents executed contracts agreeing to pay tuition for their

children to attend Clayton schools. Id. After the parents executed these

agreements, the St. Louis school district lost its state accreditation, and under

§ 167.131.1, RSMo 2000, it thereby became liable to pay the tuition required to send

the children to the Clayton schools. Id. “The parents argue[d] that the tuition

agreements should be terminated for lack of consideration and contend[ed] that

they ha[d] a right to restitution because they [were] now paying tuition for an

education their children should have received for free under § 167.131.” Id. at 669.

 The Supreme Court explained that the change in circumstances did not

result in a “failure of consideration”:

 “[C]onsideration must be measured at the time the parties enter into
 their contract and [ ] the diminished value of the economic benefit
 conferred, or even a complete lack of value, does not result in a failure
 of consideration.” Here, the parents received the benefit of their
 bargain – the education of their children by the Clayton school district
 – and, therefore, cannot claim lack of consideration.
Id. at 670 (quoting Weinstein v. KLT Telecom, Inc., 225 S.W.3d 413, 415-16 (Mo.

2007); alterations added by Turner; other citation omitted).

 Weinstein involved a “put option” agreement, under which one of the

contracting parties agreed to sell, and the other agreed to buy, shares of corporate

stock on a future date at an agreed price. The Supreme Court held that there was
no “failure of consideration” even though the stock became worthless prior to the

 12
option date, and the stock purchaser had thereby “‘suffer[ed] a disappointment in

his bargain.’” 225 S.W.3d at 416 (citation omitted).

 Similarly, in Hunt v. Dallmeyer, 517 S.W.2d 720 (Mo. App. 1974), the

purchaser of an insurance business agreed to pay the seller $7,500 per year for ten

years, so long as the purchaser remained an agent of a specified insurance company.

Id. at 721. The purchaser was later terminated as an agent for the relevant

company, and therefore had no obligation to continue making the $7,500 annual

payments. Id. at 722. Although the business seller would no longer receive the

$7,500 annual payments, the Court held that no failure of consideration had

occurred: “It is well settled that simply because one suffers a disappointment in his

bargain, a failure of consideration does not occur.” Id. at 723 (citation omitted).

 The Overmans’ “failure of consideration” argument is, in reality, simply a

claim that Equity failed to perform its contractual obligations, and that the

Overmans did not receive all of the benefit they expected from the commission

agreement. Equity’s performance did not become impossible, and the subject

matter of the contract did not cease to exist, when Simmons Bank scheduled a

foreclosure sale and Deere & Company repossessed some of the Overmans’ farm

equipment. To the contrary, it was still possible for the Overmans to retain
ownership of their land and equipment by securing alternate financing – as Rose

Ann did by securing the Conterra loan. Failure of consideration may have been an

available defense if the Overmans had lost all rights to their property through

foreclosure and repossession, and therefore had no ongoing need for financing (and

no ability to qualify for it). But that is not what happened.

 Point II is denied.

 13
 Conclusion
 The circuit court’s judgment is reversed, and the case is remanded for further

proceedings consistent with this opinion. Given our reversal of the judgment, we

deny Equity’s motion for attorney’s fees on appeal, which was taken with the case.

 Alok Ahuja, Judge
All concur.

 14