STATE of Missouri ex rel. John ASH-
CROFT, Attorney General of Missouri
and The Missouri Clean Water Commis-
sion, Appellant,

v.

UNION ELECTRIC COMPANY,
Respondent.

No. KCD 28768.

Missouri Court of Appeals,
Kansas City District.

Oct. 11, 1977.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 5, 1977.

Application to Transfer Denied
Jan. 9, 1978.

John C. Danforth, Atty. Gen., Timothy J. Verhagen, Asst. Atty. Gen., Jefferson City, for appellant.

William H. Ferrell, St. Louis, Robert J. Quigley, Eldon, William E. Jaudes, St. Louis, of counsel, for respondent.

Before SOMERVILLE, P. J., and WASSERSTROM and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

As will readily become apparent, this litigation has undulated more than a ripple on the surface of the Missouri Clean Water Law, Sections 204.006 to 204.141, RSMo Supp. 1973.

The State of Missouri on the relation of the Attorney General and the Missouri Clean Water Commission (hereinafter referred to as the State) filed a two-count petition against Union Electric Company (hereinafter referred to as Union Electric). The State subsequently amended its original petition and supplanted it with its first amended petition. By way of count one of its first amended petition the State sought to enjoin Union Electric "from causing or permitting the dissolved oxygen level in the waters downstream from the Bagnell Dam Power Plant to fall below 5 mg/l in violation of Missouri Water Quality Standards and Sections 204.051.1(1), 204.051.1(2), and 204.076.1 of the Missouri Clean Water Law" and for an "order assessing a penalty of $10,000 for each day or part thereof that defendant has or continues to cause or permit the dissolved oxygen level in the waters downstream from the Bagnell Dam to fall below 5 mg/l in violation of the Missouri Water Quality Standards." By way of count two of its first amended petition the State sought to recover damages from Union Electric in the sum of $494.42 as "authorized by Section 204.096, RSMo Supp. 1973."

Union Electric's motion to dismiss the State's petition for failure "to allege facts sufficient to constitute a cause of action against defendant or to entitle plaintiffs [sic] to any relief" was sustained by the trial court and the State has appealed.

A synoptic view of basic reigning principles for testing whether a petition states a cause of action is appropriate. All facts well pleaded are taken as admitted and liberally construed in favor of the plaintiff. *Jaime v. Neurological Hospital Ass'n of Kansas City,* 488 S.W.2d 641, 643 (Mo.1973); *Teaney v. City of St. Joseph,* 520 S.W.2d 705, 707 (Mo.App.1975); and *Johnson v. Great Heritage Life Ins. Co.,* 490 S.W.2d 686, 690 (Mo.App.1973). When appropriate substantive law is superimposed on the pleaded facts so construed, a petition is not vulnerable to a motion to dismiss for failure to state a claim or cause of action if any ground for relief is shown. *Niemczyk v. Burleson,* 538 S.W.2d 737, 742 (Mo.App. 1976); *Kersey v. Harbin,* 531 S.W.2d 76, 79 (Mo.App.1975); and *Schnabel v. Taft Broadcasting Company, Inc.,* 525 S.W.2d 819, 821 (Mo.App.1975).

Attention now focuses on the State's first amended petition, portions of which will be paraphrased for sake of brevity where appropriate, and portions of which will be quoted verbatim for sake of clarity where necessary. According to the State, as pleaded in count one, Union Electric operates a hydroelectric power generating facility on the Osage River in Miller County, Missouri, known as the "Union Electric Bagnell Dam Power Plant" (Bagnell Dam). The Osage River constitutes "waters of the state" as that phrase is defined in Section 204.016(15), RSMo Supp. 1973.[1] Union Electric in its operation of Bagnell Dam regulates the rate of flow and depth of water in the downstream area of the Osage River by periods of hydroelectric generation and nongeneration, to-wit, during periods of hydroelectric generation "water from the upstream reservoir [Lake of the Ozarks] is discharged to the downstream area of the Osage" while, on the other hand, during periods of nongeneration "upstream reservoir water is retained behind the wall of the Dam and the flow and depth of the downstream water decreases." Concomitantly, Union Electric thereby regulates the "amount of biological life-supporting 'dissolved oxygen' which is available to the fish and other aquatic life which inhabit" the downstream area. When generating hydroelectric power "a great quantity of upstream water relatively rich in dissolved oxygen is discharged into the downstream area, therein maintaining adequate levels of dissolved oxygen in the downstream area." During periods of nongeneration, however, "little or no water containing adequate levels of dissolved oxygen is permitted to flow into the downstream area, and instead, water from the bottom of the upstream reservoir which is biologically devoid or deficient in dissolved oxygen is allowed to seep under or around the Dam facility or is discharged through such facility to the downstream area, therein lowering the levels of dissolved oxygen available to such downstream area." Water which is "biologically" devoid of or deficient in "dissolved oxygen" constitutes a "water contaminant" as defined in Section 204.016(12), RSMo Supp. 1973,[2] and "the discharge (by flow or seepage) of such unoxygenated [devoid of or deficient in "dissolved oxygen"?] water to the Osage River from the Bagnell Dam constitutes a 'water contaminant source' or 'point source' as defined in Sec-

1. Section 204.016(15), RSMo Supp. 1973:

"(15) *'Waters of the state'*, all rivers, streams, lakes and other bodies of surface and subsurface water lying within or forming a part of the boundaries of the state which are not entirely confined and located completely upon lands owned, leased or otherwise controlled by a single person or by two or more persons jointly or as tenants in common and includes waters of the United States lying within the state."

2. Section 204.016(12), RSMo Supp. 1973:

"(12) *'Water contaminant'*, any particulate matter or solid matter or liquid or any gas or vapor or any combination thereof, or any temperature change which is in or enters any waters of the state either directly or indirectly by surface runoff, by sewer, by subsurface seepage or otherwise, which causes or would cause pollution upon entering waters of the state, or which violates or exceeds any of the standards, regulations or limitations set forth in sections 204.-006 to 204.141 or any federal water pollution control act, or is included in the definition of pollutant in such federal act;"

tions 204.016(13)[3] and 204.016(6),[4] RSMo Supp. 1973." The Missouri Clean Water Commission, pursuant to Section 204.026.7, RSMo Supp. 1973,[5] adopted and promulgated water quality standards which, inter alia, set up "water quality criteria", one of which, so far as here pertinent, is applicable to the Osage River and provides that "[t]he dissolved oxygen shall not be less than 5 mg/l at any time due to effluents."[6] On or about September 8, 1975, Union Electric, "by discharging unoxygenated water" from Bagnell Dam to the downstream area of the Osage River, caused and permitted the dissolved oxygen level in the downstream area to fall substantially below 5 mg/l in violation of the Missouri Water Quality Standards and in violation of Sections 204.051.-1(2)[7] and 204.076.1,[8] RSMo Supp. 1973. Union Electric, in doing so, "did cause pollution of the waters of the state in that a 1.2 mile portion of the Osage River downstream from the Bagnell Dam was rendered incapable of supporting a variety of fish life with the consequential destruction of such fish and an undetermined quantity of other organisms existent in such area, such pollution being in violation of Sections 204.051.-1(1)[9] and 204.076.1,[10] RSMo Supp. 1973."

**3.** Section 204.016(13), RSMo Supp. 1973:

"(13) '*Water contaminant source*', the point or points of discharge from a single tract of property on which is located any installation, operation or condition which includes any point source defined in sections 204.006 to 204.141 and nonpoint source under any federal water pollution control act, which causes or permits a water contaminant therefrom to enter waters of the state either directly or indirectly;"

**4.** Section 204.016(6), RSMo Supp. 1973:

"(6) '*Point source*' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged;"

**5.** Section 204.026.7, RSMo Supp. 1973:

"The commission shall: . . . 7. After holding public hearings, identify waters of the state and prescribe water quality standards for them, giving due recognition to variations, if any, and the characteristics of different waters of the state which may be deemed by the commission to be relevant insofar as possible under any federal water pollution control act. These shall be reevaluated and modified as required by any federal water pollution control act;"

**6.** Missouri Water Quality Standards, June 13, 1973, second printing, Section V, Water Quality Criteria, *Specific Criteria*, pp. 51–52.

**7.** Section 204.051.1(2), RSMo Supp. 1973:

"1. It is unlawful for any person . . . (2) To discharge any water contaminants into any waters of the state which reduce the quality of such waters below the water quality standards established by the commission if not subject to effluent regulations adopted pursuant to sections 204.006 to 204.141;"

**8.** Section 204.076.1, RSMo Supp. 1973:

"1. It is unlawful for any person to cause or permit any discharge of water contaminants from any water contaminant or point source located in Missouri in violation of sections 204.-006 to 204.141, or any standard, rule or regulation promulgated by the commission. In the event the commission or its executive secretary determines that any provision of sections 204.-006 to 204.141 or standard, rules, limitations or regulations promulgated pursuant thereto, or permits issued by, or any final abatement order, other order, or determination made by the commission or the executive secretary, or any filing requirement under sections 204.006 to 204.141 or any other provision which this state is required to enforce under any federal water pollution control act, is being, was, or is in imminent danger of being violated, the commission or executive secretary may cause to have instituted a civil action in any court of competent jurisdiction for the injunctive relief to prevent any such violation or further violation or for the assessment of a penalty not to exceed ten thousand dollars per day for each day, or part thereof, the violation occurred and continues to occur, or both, as the court deems proper. The commission or the executive secretary may request either the attorney general or a prosecuting attorney to bring any action authorized in this section in the name of the people of the state of Missouri. Suit may be brought in any county where the defendant's principal place of business is located or where the water contaminant or point source is located or was located at the time the violation occurred."

**9.** Section 204.051.1(1), RSMo Supp. 1973:

"1. It is unlawful for any person (1) To cause pollution of any waters of the state or to place or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state;"

Note: Section 204.016(7), RSMo Supp. 1973, defines "pollution" as follows: "(7) '*Pollution*', such contamination or other alterations of the physical, chemical or biological properties of any waters of the state, including

The state has good cause to believe that Union Electric, unless enjoined, will continue to discharge "unoxygenated water into the downstream area of the Osage River with a consequential destruction of untold numbers of irreplaceable and invaluable species of fish and other aquatic life which inhabit such downstream area, all in violation of Sections 204.051.1(1),[11] 204.051.1(2) [12] and 204.076.1 [13] of the Missouri Clean Water law." Finally, the State alleges that it has "no adequate remedy at law" and its action "for injunction and penalties is authorized by Section 204.076.1 [14]."

According to the State, as pleaded in count two, by reason of Union Electric's conduct as pleaded in count one certain species of fish of the value of $356.63 were killed and expenses in the amount of $141.79 were incurred by employees of the State in investigating said loss, recovery of which is authorized by Section 204.096, RSMo Supp. 1973.[15]

It is axiomatic that appellate disposition of this case pivots on the meaning of Sections 204.051.1(1), 204.051.1(2), and 204.076.-1, supra. Although the State views this litigation as a noble environmental crusade, Union Electric is highly suspicious, and, however highly motivated the State may be, views the litigation as an effort to effectively destroy its Bagnell Dam hydroelectric power generating facility. Hence, the antipodal positions taken by the parties with respect to the meaning of the pivotal statutory provisions are not always marked by an excogitative approach as they occasionally reflect a flurry of pent-up emotions.

On occasions, no judicial task is more arduous, no judicial responsibility heavier than the construction of legislative enactments. The problem is compounded in this state because there is no counterpart to the Congressional Record to turn to for aid in ascertaining legislative intent. Nevertheless, courts are impressed with a judicial obligation to construe and determine the meaning of ambiguous legislative acts in justiciable controversies if it is possible to do so. *State ex rel. Union Electric Light & Power Co. v. Baker*, 316 Mo. 853, 293 S.W. 399, 401 (banc 1927). Rules or canons of construction, whose numbers are legion, are aids for ascertaining the meaning of legislative acts and nothing more; they do not rise to the solemnity and authoritative control attributable to principles of law. Although all rules or canons of statutory construction are cognate in their purpose or function, they are widely diverse in nature and many times conflicting. Nevertheless, one cardinal rule or canon, free of diversity or conflict, stands out with stark clarity—the intent of the legislature controls. As aptly stated in *Edwards v. St. Louis County*, 429 S.W.2d 718, 722 (Mo. banc 1968), "[i]n all these diverse and sometimes conflicting rules the ultimate guide is the intent of the legislature; the other rules of construction may be considered merely as aids in reaching that result; and the purpose and object of the legislation should not

change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is reasonably certain to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, industrial, agricultural, recreational, or other legitimate beneficial uses, or to wild animals, birds, fish or other aquatic life;"

10. Section 204.076.1, supra, n8 p. 219.

11. Section 204.051.1(1), supra, n9 p. 219.

12. Section 204.051.1(2), supra, n7 p. 219.

13. Section 204.076.1, supra, n8 p. 219.

14. Section 204.076.1, supra, n8 p. 219.

15. "In addition to other penalties prescribed in sections 204.006 to 204.141, the state, or any political subdivision or agency thereof, has a cause of action against any person violating the provisions of sections 204.006 to 204.141 for actual damages, including all costs and expenses necessary to establish or collect any sums under sections 204.006 to 204.141, and the costs and expenses of restoring any waters of the state to their condition as they existed before the violation, sustained by it because of the violation. The action shall be brought by the attorney general or a prosecuting attorney in any court where an action for injunctive relief hereunder could be brought."

be lost sight of." See also: *State ex rel. Schwab v. Riley,* 417 S.W.2d 1, 4 (Mo. banc 1967); *State ex rel. Lee American Freight System, Inc. v. Public Service Commission,* 411 S.W.2d 190, 193 (Mo. banc 1966); and *Laclede Gas Co. v. City of St. Louis,* 363 Mo. 842, 253 S.W.2d 832, 835 (banc 1953). Thus, ascertainment of legislative intent is both the goal and ultimate rule of statutory construction to which all other rules or canons of construction are subordinate. Moreover, subordinate aids were never intended to be utilized as ploys to subvert legislative intent. Their function and purpose is to subserve legislative intent. Consistent with this thought, the following rules or canons of construction are aids deemed to be subservient to ascertainment of the legislative intent pervading the Missouri Clean Water Act. Legislative construction of certain words or phrases incorporating certain definitions in a statute or act under judicial scrutiny is binding on the courts and such statutory definitions supersede commonly accepted dictionary or judicial definitions. *In re Estate of Hough,* 457 S.W.2d 687, 691 (Mo.1970); *State ex rel. Exchange Bank of Richmond v. Allison,* 155 Mo. 325, 56 S.W. 467, 468 (1900); and *Fox v. Standard Oil Co. of New Jersey,* 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780. Words free of statutory definition are to be given their usual, plain and ordinary meaning. *State ex rel. Zoological Pk. Subd., St. Louis v. Jordan,* 521 S.W.2d 369, 372 (Mo.1975); and *State ex rel. State Highway Com'n v. Wiggins,* 454 S.W.2d 899, 903 (Mo. banc 1970). An equally significant rule or canon of construction is that various sections of a single act should be construed so as to render the act a consistent and homogeneous whole. *Spitcaufsky v. Hatten,* 353 Mo. 94, 182 S.W.2d 86, 110 (banc 1944); and *Gladden v. Kansas City,* 536 S.W.2d 478, 480 (Mo.App. 1976).

The above comprise a legal matrix from which to fathom the legislative intent pervading the Missouri Clean Water Law, supra, and, more particularly, the meaning of the specific sections of the Missouri Clean Water Law, supra, relied upon by the State as a substantive basis for its alleged cause of action against Union Electric.

Tautly summarized, the State contends on appeal that its first amended petition demonstrates that Union Electric, at certain times, in the operation of its Bagnell Dam hydroelectric power generating facility "discharges" a "water contaminant", i.e. water with a dissolved oxygen level below 5 mg/l, from the upstream reservoir area of the Osage River above Bagnell Dam to the downstream area of the Osage River below Bagnell Dam, thereby polluting the downstream area of the Osage River in violation of Sections 204.051.1(1), 204.051.1(2), and 204.076.1, supra. Summarized with equal tautness, Union Electric contends on appeal, albeit with considerable lack of perspicuity, that its regulation of the movement of water from one area to another in the Osage River, assuming, arguendo, that at times water with a dissolved oxygen level below 5 mg/l is present, is not proscribed by Sections 204.051.1(1), 204.051.1(2), and 204.-076.1, supra, because conduct on its part which merely affects the movement of water from one area to another in the Osage River is not within the proscriptive purview of the Missouri Clean Water Law, supra.

The Missouri Clean Water Law, supra, is ensconced in a broad, pervasive legislative intent to keep the "waters of the state" free of "pollution" from *external* causes and sources. All of the proscriptive provisions contained in the Missouri Clean Water Law, Sections 204.051.1(1), 204.051.1(2), and 204.076.1, supra, which the State alleges Union Electric violated, bespeak of the broad, pervasive legislative intent just mentioned.

Section 204.051.1(1), supra, repeated for sake of convenience, reads: "1. It is unlawful for any person (1) to cause pollution of any waters of the state or to place or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state;". This section, concededly convoluted, seeks to suppress as unlawful "pollution of any waters of the state"

and causing or permitting any "water contaminant" to be placed "in a location where it is reasonably certain to cause pollution of any waters of the state". "Pollution" and "water contaminant" are key words in Section 204.051.1(1), supra, as evidenced by the fact that they have been statutorily defined. Furthermore, "discharge" is a key word in the definition of "pollution" as evidenced by the fact that it too has been statutorily defined. Section 204.016, RSMo Supp. 1973, which statutorily defines fifteen words and phrases employed in the Missouri Clean Water Law, supra, contains the following preface: "When used in sections 204.006 to 204.141 and in standards, rules and regulations promulgated under authority of sections 204.006 to 204.141, the following words and phrases shall have the meanings ascribed to them in this section unless the context clearly requires otherwise." "Pollution" is statutorily defined in subparagraph (7) of Section 204.016, supra, and here repeated: "(7) *Pollution*', such contamination or other alterations of the physical, chemical or biological properties of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is reasonably certain to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, industrial, agricultural, recreational, or other legitimate beneficial uses, or to wild animals, birds, fish or other aquatic life;". By statutory definition "pollution" contemplates two methods for producing one or more of several common results: (1) by "contamination or other alterations of the physical, chemical or biological properties of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters . . . as will or is reasonably certain to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, industrial, agricultural, recreational, or other legitimate beneficial uses, or to wild animals, birds, fish or other

aquatic life;" and (2) by "*discharge* of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is reasonably certain to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, industrial, agricultural, recreational, or other legitimate beneficial uses, or to wild animals, birds, fish or other aquatic life;" (emphasis added). "Pollution" effected by the first method entails the play of some external force causing "contamination" or "other alteration" of the "physical, chemical or biological properties of any waters of the state". This court notes that the State failed to plead that Union Electric caused the water in the lower levels of the upstream reservoir area of the Osage River to be "biologically" devoid of or deficient in "dissolved oxygen". Pleadingwise, whether the complained of condition in the upstream reservoir area of the Osage River is a phenomenon of nature or manmade remains unanswered by the State. Instead, the State attempts to rely upon the second method contemplated in the statutory definition of "pollution", videlicet, "discharge" by Union Electric of a "liquid", i.e. water "biologically" devoid of or deficient in "dissolved oxygen", from the upstream reservoir area of the Osage River above Bagnell Dam to the downstream area of the Osage River below Bagnell Dam which rendered the downstream area "incapable of supporting a variety of fish life with the consequential destruction of such fish and an undetermined quantity of other organisms existing in such area". By doing so, the State asserts in its petition that Union Electric polluted the downstream area of the Osage River and thereby violated Section 204.051.1(1), supra. The fallacy of this assertion is demonstrated by the statutory definition of "discharge" contained in Section 204.016(1), RSMo Supp. 1973: "(1) *Discharge*', the causing or permitting of one or more water contaminants to *enter* the waters of the state;" (emphasis added). Section 204.016(12), supra, reiterated for purposes of clarity, statutorily defines "water contaminant" as follows: "(12)

'*Water contaminant*', any particulate matter or solid matter or liquid or any gas or vapor or any combination thereof, or any temperature change which is in or enters any waters of the state either directly or indirectly by surface runoff, by sewer, by subsurface seepage or otherwise, *which causes or would cause pollution upon entering waters of the state,* or which violates or exceeds any of the standards, regulations or limitations set forth in sections 204.006 to 204.141 or any federal water pollution control act, or is included in the definition of pollutant in such federal act;" (emphasis added). "Enter", a verb, is defined in Webster's Third New International Dictionary as "to go or come into a material place; to make a physical entrance or penetration". Beyond peradventure, in view of these various definitions, Union Electric, under the State's pleading, did not "cause" or "permit" a "water contaminant", i.e. water "biologically" devoid of and deficient in "dissolved oxygen", to "enter" the Osage River. Furthermore, it is self-evident from the same definitions, that Union Electric, under the State's pleading, neither "polluted" the Osage River nor caused or permitted a "water contaminant" to be placed "in a location" where it was "reasonably certain to cause pollution" of the Osage River. The most that can be said is that Union Electric at times caused or permitted an internal flow of water in the Osage River which, according to the State, was "biologically" devoid of or deficient in "dissolved oxygen". Such, however, does not rise to the level of conduct proscribed by Section 204.051.1(1), supra, as its impetus is the suppression of pollution from external causes and sources.

Sections 204.051.1(2) and 204.076.1, supra, also purportedly violated by Union Electric, reveal the broad pervasive legislative intent undergirding the Missouri Clean Water Law with even greater fluency. Section 204.051.1(2), supra, at the risk of being repetitious, declares it to be unlawful for any person "[t]o *discharge* any water contaminant into any waters of the state which reduce the quality of such water below the water quality standards established by the commission if not subject to effluent regu-lations adopted pursuant to sections 204.006 to 204.141." (Emphasis added.) Section 204.076.1, supra, also reiterated, makes it "unlawful for any person to cause or permit any *discharge* of water contaminants from any water contaminant or point source located in Missouri in violation of Sections 204.006 to 204.141, or any standard, rule or regulation promulgated by the commission." (Emphasis added.) By reason of having statutorily defined "discharge", a key word common to both sections, the legislature obviously saw fit to delete all doubt from its meaning. To be guilty of a "discharge" of any "water contaminants" into any "waters of the state" as proscribed by Section 204.051.1(2), supra, or of causing or permitting any "discharge" of "water contaminants" from any "water contaminant or point source", as proscribed by Section 204.076.1, supra, the alleged offender must "cause" or "permit" such "water contaminant to enter the waters of the state". See statutory definition of "discharge", Section 204.016(1), supra. No claim is made by the State by way of its pleading, or otherwise, that Union Electric discharged water "biologically" devoid of or deficient in "dissolved oxygen" into the Osage River from an external source or that it discharged something from an external source into the Osage River which rendered a portion of the waters of the Osage River "biologically" devoid of or deficient in "dissolved oxygen".

As all appropriate avenues of statutory construction converge upon the existence of a broad, pervasive legislative intent to keep the "waters of the state" free of "pollution" from *external* causes or sources, Sections 204.051.1(1), 204.051.1(2), and 204.-076.1, supra, are accordingly circumscribed and the trial court had no choice but to dismiss both counts of the State's petition for failure to state a claim or cause of action. Tersely summarized, superimposition of Sections 204.051.1(1), 204.051.1(2), and 204.076.1, supra, on the facts pleaded by the State, after liberally construing and accepting such facts as true, fails to afford the State any ground for relief.

The difficultly laden task of filtering the murky areas of the Missouri Clean Water Law, supra, is made even more difficult by

reason of the classic, conflicting interests of the parties as exemplified by the State's pursuit of an environmental sanctuary in the downstream area of the Osage River below Bagnell Dam and Union Electric's supplication to retain unimpeded use of its hydroelectric power generating facility. However, it does not devolve upon this court to weigh the merits of an environmental sanctuary in the downstream area of the Osage River with the unimpeded maximum utilization of a clean and relatively inexpensive source of electric energy by Union Electric. It is the prerogative of the general assembly to decide by way of appropriate amendatory legislation whether a different balance should be struck between environmental purity and the public's insatiable demand for energy. This court's duty is limited to determining whether the relief sought by the State in its petition is authorized and supported by substantive, statutory law. Having concluded that it is not, the judgment below must be affirmed.

Judgment affirmed.

All concur.