**Sherita FUGATE, Appellant,**

**v.**

**JACKSON HEWITT, INC., Respondent.**

**No. WD 72353.**

Missouri Court of Appeals,
Western District.

March 1, 2011.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 29, 2011.

Application for Transfer Denied
Oct. 4, 2011.

---

Bert S. Braud, Kansas City, MO, for Appellant.

Daniel B. Hodes, Charles W. German, Kansas City, MO, for Respondent.

Before CYNTHIA L. MARTIN, P.J., JAMES EDWARD WELSH, and GARY D. WITT, JJ.

JAMES EDWARD WELSH, Judge.

Sherita Fugate appeals the circuit court's judgment dismissing her petition for a class action complaint against the tax preparation company Jackson Hewitt, Inc. Fugate had alleged in her petition that Jackson Hewitt failed to comply with statutory requirements for credit services organizations when it obtained an income tax refund anticipation loan ("RAL") for her. She further alleged that Jackson Hewitt's noncompliance with the credit services organizations statutes constituted a violation of the Missouri Merchandising Practices Act. The circuit court dismissed Fugate's petition on the basis that Jackson Hewitt was not a credit services organization and, therefore, was not subject to the statutory requirements for credit services organizations. Alternatively, the court concluded that dismissal was appropriate because, even if Jackson Hewitt were a credit services organization, Fugate failed to allege any actual damages that she suffered as a result of Jackson Hewitt's noncompliance with the statutory requirements. Fugate challenges these conclusions on appeal.

We reverse and remand the case to the circuit court for further proceedings.

■ When reviewing a motion to dismiss for failure to state a claim, we treat the facts contained in the petition as true. *Hamid v. Kansas City Club,* 293 S.W.3d 123, 125 (Mo.App.2009). The facts, as alleged in Fugate's petition, are as follows. On January 19, 2007, Jackson Hewitt prepared Fugate's 2006 federal income tax return. At the same time, Jackson Hewitt obtained an extension of credit for her in the form of an RAL from Santa Barbara Bank & Trust ("SBBT"). The RAL was based upon Fugate's anticipated income tax refund. Fugate indirectly paid Jackson Hewitt for arranging her RAL because the principal amount of the loan included the cost of obtaining the loan. Additionally, the RAL included in its principal amount the fees Jackson Hewitt charged for the preparation and filing of Fugate's federal income tax return. Fugate's RAL agreement with SBBT[1] indicated that Jackson Hewitt received money from SBBT in connection with the extension of credit to Fugate. Specifically, the agreement stated that SBBT "will pay compensation to" Jackson Hewitt in consideration of rights that Jackson Hewitt granted to SBBT and services that Jackson Hewitt performed on behalf of SBBT.

Fugate filed her petition for a class action against Jackson Hewitt two years after the RAL transaction. In Count I of her petition, Fugate contended that, because Jackson Hewitt obtained an extension of credit for her, Jackson Hewitt was a credit services organization pursuant to section 407.637, RSMo 2000. Fugate alleged that, as a credit services organiza-

---

1. The RAL agreement was attached as an exhibit to Fugate's petition. Therefore, the agreement was a part of the petition "for all purposes" and is to be considered as part of the allegations in determining whether the petition states a claim upon which relief can be granted. Rule 55.12; *Hendricks v. Curators of Univ. of Mo.,* 308 S.W.3d 740, 747 (Mo.App.2010).

tion, Jackson Hewitt was required to comply with certain statutory requirements but failed to do so. In particular, Fugate alleged that Jackson Hewitt failed to register with the Director of Finance as a credit services organization as required by section 407.640, RSMo 2000; failed to obtain a surety bond or establish a surety account as required by section 407.639, RSMo 2000; failed to provide her with documents and disclosures required by section 407.641, RSMo 2000, including a statement of the buyer's rights; and failed to provide her with documents and disclosures required by section 407.642, RSMo 2000, including copies of a notice of cancellation and a contract with the necessary inclusions.

Fugate claimed that Jackson Hewitt's noncompliance with these statutes gave rise to a cause of action under section 407.644, RSMo 2000. Section 407.644.1(1) says that "[a] buyer injured by a violation of sections 407.635 to 407.644 may bring an action for the recovery of damages. The damages awarded may not be less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and court costs." The statute also permits an award of punitive damages. § 407.644.1(2). Fugate alleged that Jackson Hewitt's violations damaged her and the proposed class members[2] in an amount equal to all fees and charges they incurred in connection with Jackson Hewitt's arrangement of the RAL.

In Count II of her petition, Fugate contended that Jackson Hewitt violated the Merchandising Practices Act, sections 407.010–407.130, RSMo. Section 407.644.3 provides that a violation of the credit services organization statutes is an unlawful practice under the Merchandising Practices Act, and that the violator "shall be subject to all penalties, remedies and procedures provided in sections 407.010 to 407.130."

Jackson Hewitt moved to dismiss Fugate's petition. Following a hearing, the circuit court dismissed Fugate's petition after concluding that it failed to state a claim upon which relief could be granted. The court determined that Jackson Hewitt was not a credit services organization under Missouri law, and therefore, Fugate could not maintain a cause of action for Jackson Hewitt's alleged noncompliance with the statutory requirements for a credit services organization. The court also concluded that, even if Jackson Hewitt were a credit services organization, Fugate could not prevail because she did not allege any actual damages that she suffered due to Jackson Hewitt's failing to identify itself as a credit services organization and its failing to make the statutorily-required disclosures. Because Fugate's Merchandising Practices Act violation claim in Count II was predicated upon the successful prosecution of her claim in Count I, the court dismissed both counts of her petition. Fugate appeals.

We review a dismissal for failure to state a claim *de novo*. *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008). A motion to dismiss for failure to state a claim "is solely a test of the adequacy of the plaintiff's petition." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 101 (Mo. banc 2010). We accept the plaintiff's allegations as true, and we do not attempt to weigh any of the alleged facts or judge

---

**2.** Fugate's proposed class consisted of all Missouri residents who, in the four years preceding the filing of the petition and thereafter, obtained from Jackson Hewitt an RAL, for which Jackson Hewitt received a fee for obtaining or helping to obtain or arrange, and for which Jackson Hewitt had not complied with the statutory requirements for credit services organizations.

their credibility or persuasiveness. *Id.* "The petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action or of a cause that might be adopted in that case." *Id.* In making this determination, we give the pleadings their broadest intendment and most liberal construction, and we accord the petition " 'all reasonable inferences deducible from the facts stated.' " *Lakeridge Enters., Inc. v. Knox,* 311 S.W.3d 268, 271 (Mo.App.2010) (citation omitted).

 In her first point, Fugate claims that the dismissal was erroneous because Jackson Hewitt is a credit services organization under the plain language of the credit services organization statutes. In interpreting the credit services organization statutes to determine their applicability to Jackson Hewitt, we must " 'ascertain the intent of the legislature from the language used, . . . give effect to that intent if possible, and . . . consider the words in their plain and ordinary meaning.' " *S. Metro. Fire Prot. Dist. v. City of Lee's Summit,* 278 S.W.3d 659, 666 (Mo. banc 2009) (citation omitted). "If statutory language is not defined expressly, it is given its plain and ordinary meaning, as typically found in the dictionary." *Derousse v. State Farm Mut. Auto. Ins. Co.,* 298 S.W.3d 891, 895 (Mo. banc 2009).

Section 407.637.1 defines a credit services organization:

1. A credit services organization is a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides or represents that the person can or will provide any of the following services:

(1) Improving the buyer's credit record, history or rating;

(2) Obtaining an extension of credit for a buyer; or

(3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2) of this subsection.

Two of this statute's terms are further defined in section 407.635, RSMo 2000. Section 407.635(3) defines an "extension of credit" as "the right to defer payment of debt or to incur debt and defer its payment offered or granted primarily for personal family or household purposes." Section 407.635(1) defines a "buyer" as "an individual who is solicited to purchase or who purchases the services of a credit services organization."

 In her petition, Fugate asserted that Jackson Hewitt obtained an extension of credit for her, in the form of an RAL, from SBBT. Fugate further asserted that she indirectly paid Jackson Hewitt for obtaining the RAL because the principal amount of the loan included the cost of obtaining it, and her agreement with SBBT disclosed that SBBT paid Jackson Hewitt for services that Jackson Hewitt performed in connection with Fugate's RAL.

There is no dispute that the RAL was an extension of credit, as it was a debt that Fugate incurred and deferred paying until she received her federal income tax refund. The dispute in this case is whether Fugate's allegations that she indirectly paid Jackson Hewitt because she paid SBBT for the cost of obtaining the RAL, who, in turn, paid Jackson Hewitt, were sufficient to demonstrate (1) that she was a "buyer," and (2) that Jackson Hewitt was a "credit services organization" because it obtained the RAL for her "in return for the payment of money." Jackson Hewitt argues that Fugate had to allege that she directly paid Jackson Hewitt for obtaining the RAL in order to satisfy the statutory definitions of a "buyer" and a "credit services organization." We disagree, howev-

er, because neither definition contains a requirement that the consumer directly pay the loan arranger for obtaining the loan.

To plead that she was a "buyer" under section 407.635(1), Fugate had to allege facts showing that she purchased Jackson Hewitt's service of obtaining the RAL for her. The plain and ordinary meaning of "purchase" is "to obtain (as merchandise) by paying money or its equivalent: buy for a price." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1844 (1993). This dictionary definition of "purchase" requires that the recipient of goods, or in this case, services, pay money or other consideration for obtaining such services. It also requires that the provider of services receive payment for such services. It does not, however, require a direct payment from the recipient to the provider for the services. Nothing in section 407.635(1)'s definition of a "buyer" requires that the payment from the buyer to the credit services organization be a direct payment.

Similarly, nothing in section 407.637.1's definition of a "credit services organization" as a person who provides services "in return for the payment of money or other valuable consideration" requires that it be a direct payment. Jackson Hewitt notes that the dictionary definition of the phrase "in return" is "to give or perform in return: repay" and "to respond in kind." [3] Although Jackson Hewitt argues that this language contemplates only a direct exchange of payment for services between the buyer and the credit services organization, we do not read it so narrowly. As long as the credit services organization provides services to the buyer, the buyer pays for those services, and the credit services organization receives payment for the services, section 407.637.1 is satisfied. There is nothing explicit or implicit in the plain and ordinary meaning of the phrase "in return" that requires a direct payment from the buyer to the credit services organization.

The plain and ordinary meaning of the statutory language defining a "buyer" and a "credit services organization" is broad enough to encompass both direct and indirect payments. Construing Fugate's petition liberally and according all reasonable inferences from the facts stated, we find that Fugate sufficiently pled that she was a buyer under section 407.635(1) and that Jackson Hewitt was a credit services organization under section 407.637.1. [4]

In so holding, we reject Jackson Hewitt's contention that the legislature intended that the credit services organization statutes apply to only traditional credit repair businesses, that is, entities who offer to help consumers fix a bad credit record. The legislature defined a "credit services organization" as a person who provides, or represents that it can provide, "any" of the services listed in section 407.637.1's three subdivisions. The service listed in subdivision (1), "[i]mproving the buyer's credit record, history or rating," refers to a service that is typically provid-

---

3. In support of this definition, Jackson Hewitt cites the definition of the word "return" from MERRIAM-WEBSTER'S DICTIONARY 1065 (11th ed.2004).

4. We emphasize that, pursuant to our standard of review, we do not judge the credibility or persuasiveness of Fugate's allegations but, rather, review them only to determine if they state the elements of a recognized cause of action. *Keveney,* 304 S.W.3d at 101. Thus, Fugate's allegations that Jackson Hewitt obtained an RAL for her from SBBT and that she indirectly paid Jackson Hewitt for obtaining the RAL are sufficient to survive a motion to dismiss. To proceed further, however, Fugate must support these allegations with the requisite proof.

ed by traditional credit repair businesses. § 407.637.1(1). The services listed in subdivisions (2) and (3), two of which include obtaining an extension of credit for a buyer and providing advice or assistance to a buyer with regard to obtaining an extension of credit, are not services that are provided by only credit repair businesses. There is nothing implicit or explicit in the language of section 407.637.1 that limits the definition of "credit services organization" to only credit repair businesses.[5]

Nevertheless, Jackson Hewitt insists that, when section 407.637.1 is considered *in pari materia* with other credit services organization statutes, it shows the legislature's intent to limit section 407.637.1's applicability to only credit repair businesses.[6] We need not look beyond section 407.637.1 to interpret its meaning, however, because the statutory language is clear. *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 668–69 (Mo. banc 2010). When a statute's own language is clear and unambiguous, we do not apply the canons of statutory construction to determine the legislature's intent. *Id.* at 669.

 Similarly, we reject Jackson Hewitt's contention that we should adopt its interpretation because the Division of Finance's website refers only to credit repair businesses on its webpage concerning the licensing of credit services organizations. *Credit Service Organizations, Missouri Division of Finance*, State of Missouri, http://finance.mo.gov/consumercredit/creditservice.php (last accessed Feb. 22, 2011). We recognize that "[t]he interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *State ex rel. Barnett v. Mo. State Lottery Comm'n*, 196 S.W.3d 72, 75 (Mo.App.2006) (internal quotation omitted). We question, however, whether the Division's six-sentence summary of the credit services organization statutes on its website constitutes an official "interpretation" of those statutes. Moreover, it would be inappropriate for this court to defer to an agency's interpretation of a statute that expands, narrows, or is inconsistent with the plain and ordinary meaning of the words of the statute. *See Dep't of Soc. Servs., Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray Co.*, 224 S.W.3d 1, 15 (Mo.App.2007). An interpretation of section 407.637.1 that narrows the definition of a "credit services organization" to only a credit repair business is inconsistent with the plain and ordinary meaning of the statute.

Section 407.637.2 provides a list of ten entities that are exempt from the credit services organization statutes. These entities include, among other things, real estate brokers, lawyers, and stocks and commodities broker-dealers, none of which are

5. Unlike Missouri's credit services organization statutes, the federal Credit Repair Organizations Act, § 15 U.S.C. 1679, *et seq.*, does limit its applicability to credit repair organizations. Pursuant to § 15 U.S.C. 1679a(3)(A) (1996), a credit repair organization:

(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of-

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

6. Jackson Hewitt points to certain provisions in section 407.638 which prohibit activities that are typically associated with credit repair businesses. Jackson Hewitt also contends that some of the required disclosures in section 407.641, RSMo 2000, are relevant only in the context of credit repair transactions.

considered credit repair businesses. Thus, if, as Jackson Hewitt contends, the plain and ordinary meaning of section 407.637.1 were to refer only to credit repair businesses, a provision expressly exempting certain entities that are not considered credit repair businesses would be unnecessary. We presume that " 'the legislature did not insert verbiage or superfluous language in a statute.' " *Turner*, 318 S.W.3d at 673 (citation omitted).

If the legislature had intended that the credit services organization statutes not apply to tax preparers who offer or obtain RALs for their customers, it could have included them in section 407.637.2's list of exemptions.[7] That the legislature did not indicates its intent that the credit services organization statutes apply to such entities. *See Brinker Mo., Inc. v. Dir. of Revenue*, 319 S.W.3d 433, 438 (Mo. banc 2010).

Pursuant to the plain and ordinary meaning of section 407.637, Fugate's allegations that Jackson Hewitt obtained an RAL for her and that she indirectly paid Jackson Hewitt for doing so were sufficient to plead that Jackson Hewitt was a "credit services organization" subject to the provisions of sections 407.635 to 407.644. The circuit court erred in dismissing on this basis. We grant Fugate's first point.[8]

In her second point, Fugate claims that the dismissal was erroneous because, contrary to the circuit court's conclusion, she sufficiently pled an injury that she suffered due to Jackson Hewitt's noncompliance with the credit services organization statutes. Missouri is a " 'fact-pleading' state." *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 379 (Mo. banc 1993). "If the petition contains only conclusions and does not contain the ultimate facts or any allegations from which to infer those facts, the petition may be dismissed for failure to state a claim." *Bohac v. Walsh*, 223 S.W.3d 858, 862 (Mo.App.2007).

The statute that provides for a cause of action based upon a violation of the credit services organization statutes is section 407.644.1(1). Section 407.644.1(1) says that "[a] buyer injured by a violation of sections 407.635 to 407.644 may bring an

7. For example, we note that Delaware, whose definition of a credit services organization is identical to Missouri's, exempts loan brokers "who are not engaged in the other activities of credit services organizations as described in subsection (a) of this section." DEL.CODE ANN tit. 6, § 2402(b)(10) (2006). The "other activities" language refers to "[i]mproving a buyer's credit record, history or rating" or providing advice or assistance in doing so. DEL.CODE ANN. tit. 6, § 2402(a) (2006). Thus, Delaware specifically exempts entities that obtain loans for buyers but do not provide credit repair services.

8. This is a case of first impression in Missouri. The Supreme Court of Appeals of West Virginia recently addressed this exact issue in *Harper v. Jackson Hewitt, Inc.*, 227 W.Va. 142, 706 S.E.2d 63 (W.Va.2010). In holding that Jackson Hewitt was a credit services organization pursuant to W. Va.Code § 46A–6C–2(a) (2004), which is identical to our section 407.637.1, the West Virginia court said that the "plain and broad sweeping language contained in the statute leads us to no other possible conclusion." *Id.* at 71. Rejecting Jackson Hewitt's contention that the statute required direct payments from the consumer to the credit services organization, the court found that "a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a RAL meets the statutory definition of a credit services organization under W. Va.Code § 46A–6C–2(a)." *Id.* The court also found that the plaintiffs qualified as "buyers" under W. Va. Code § 46A–6C–1(1) (1991), which is identical to our section 407.635(1), because the plaintiffs "purchased, whether indirectly or directly, the services of a credit services organization." *Id.* at 72.

action for recovery of damages. The damages awarded may not be less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and court costs."

In her petition, Fugate alleged that Jackson Hewitt violated the credit services organization statutes by failing to register as a credit services organization with the Director of Finance, failing to obtain a surety bond or establish a surety account, and failing to give her required documents and disclosures. Fugate further alleged that, "[a]s a result of Jackson Hewitt's violations of the Credit Service Organizations Act, Ms. Fugate and the proposed class have been damaged in an amount equal to all fees and charges they incurred in connection with Jackson Hewitt's arrangement of the RAL."

A reasonable inference from the allegations in Fugate's petition is that she was injured by Jackson Hewitt's violations because she paid for its services without receiving the protections, documents, and disclosures that a credit services organization is statutorily required to provide to a buyer. Thus, she alleged an injury. Whether her alleged injury is credible or persuasive is not a decision for this court to make in reviewing a dismissal for failure to state a claim. *Keveney*, 304 S.W.3d at 101. Count I of Fugate's petition pled a claim under section 407.644.1. The circuit court erred in dismissing on this basis. We grant Fugate's second point.

We, therefore, reverse the circuit court's determination that Fugate failed to state a claim under the credit services organization statutes. Consequently, we also reverse the circuit court's dismissal of her Merchandising Practices Act claim, which is predicated upon her claim under the credit services organization statutes. The case is remanded to the circuit court for further proceedings.

Judge GARY D. WITT concurs.

Presiding Judge CYNTHIA L. MARTIN writes the dissent.

CYNTHIA L. MARTIN, Presiding Judge.

I respectfully dissent from the majority opinion's conclusion that Jackson Hewitt is a "credit services organization" subject to the provisions of sections 407.635 to 407.644. I would affirm the trial court's dismissal of Fugate's petition.

I agree with the majority opinion's observation that in interpreting the credit services organization *statutes* to determine their applicability to Jackson Hewitt, we must "'ascertain the intent of the legislature from the language used, [ ] give effect to that intent if possible, and [ ] consider the words in their plain and ordinary meaning.'" *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009) (citation omitted). I disagree, however, with the manner in which the majority has undertaken to ascertain the intent of the legislature. The majority has assessed legislative intent by isolating its focus on section 407.637.1 without regard to the fact that section 407.637.1 is but one statute within the Credit Services Organization Act, sections 407.635 to 407.644 ("Act"). In doing so, the majority has improvidently applied a dictionary definition of the word "purchase" in a manner that is inconsistent with the plain and usual meaning of the word. As a result, the majority has ascribed a meaning to the definition of "credit services organization" that is inherently inconsistent with other provisions of the Act.

Section 407.637.1 defines a credit services organization as:

1. A credit services organization is a person who, with respect to the exten-

sion of credit by others and *in return for the payment of money or other valuable consideration,* provides or represents that the person can or will provide any of the following services:

(1) Improving the buyer's credit record, history or rating;

(2) *Obtaining an extension of credit for a buyer; or*

(3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2) of this subsection.

(Emphasis added.) Fugate contends that section 407.637.1(2) applies to this case. Thus, Fugate's petition had to assert that (a) she was a *"buyer,"* and (b) that Jackson Hewitt, *"in return for the payment of money or other valuable consideration"* obtained an extension of credit for her. More to the point, Fugate's assertions with respect to these two essential components of her claim must fit within the contours of the legislature's intended meaning of "buyer" and "in return for the payment of money or other valuable consideration" in order for Fugate's petition to survive a motion to dismiss.

Fugate's petition asserts that "Fugate *indirectly* paid Jackson Hewitt for arranging" a refund anticipation loan ("RAL"). Fugate's petition further asserts that "Jackson Hewitt *received money from SBBT in connection with the extension of credit* to … Fugate." Fugate's petition thus concedes that she did not pay Jackson Hewitt directly, and that she did not have an obligation to pay Jackson Hewitt directly, for its service in putting her in contact with Santa Barbara Bank & Trust ("SBBT"), from whom Fugate sought and obtained an extension of credit. Fugate's petition concedes that the only entity with whom she had a contract for the extension of credit, and the only entity which received payment of money from her for the extension of credit, was SBBT.

As the majority correctly notes, the debate in this case focuses on whether the legislature intended the Act to cover indirect transactions of this nature. Stated differently, we must ascertain whether the legislature intended to require that a person directly pay, or have a direct obligation to pay, an entity before that person is a "buyer" with respect to the entity, and before the entity can be said to have provided a service "in return for the payment of money or other valuable consideration" to the buyer.

Fugate suggests that the word "buyer" and the phrase "in return for the payment of money" should be construed to permit the *direct or indirect* payment of money from the purported buyer to the purported credit services organization. Jackson Hewitt suggests that the word "buyer" and the phrase "in return for the payment of money" should be construed to require the *direct* payment of money from the purported buyer to the purported credit services organization.

### Ascertaining Legislative Intent

Statutory construction is a matter of law. *City of St. Joseph v. Vill. of Country Club,* 163 S.W.3d 905, 907 (Mo. banc 2005). "The goal of statutory analysis is to ascertain the intent of the legislature, as expressed in the words of the statute." *United Pharmacal Co. of Mo., Inc. v. Mo. Bd. of Pharmacy,* 208 S.W.3d 907, 909–10 (Mo. banc 2006). There is no need to resort to the rules of statutory construction to ascertain legislative intent where the language of the statute is unambiguous and clear. *Maxwell v. Daviess Cnty.,* 190 S.W.3d 606, 610 (Mo.App. W.D.2006). The first step, therefore, in this case, is to read section 407.637.1 in its "plain, ordinary, and usual sense." *Bosworth v. Sewell,* 918 S.W.2d 773, 777 (Mo. banc 1996). In fact, we are directed by the legislature to do just that pursuant to section 1.090, which

provides that "[w]ords and phrases shall be taken in their plain or ordinary and usual sense." In so doing, we are also required to afford words that are defined by the legislature their statutory definition. *State ex rel. Ashcroft v. Union Elec. Co.*, 559 S.W.2d 216, 221 (Mo.App.1977).

Section 407.635(1) defines a "buyer" as "an individual *who is solicited to purchase or who purchases the services of* a credit services organization." (Emphasis added.) The clearly operative word in the statutory definition of "buyer" is the word "purchase." "Purchase" is *not* defined, however, in section 407.635. Similarly, neither the phrase "in return for the payment of money or other valuable consideration" nor its components terms, are statutorily defined. Thus, we afford the word "purchase," and the words "in return" and "payment" their "plain and ordinary meaning, as typically found in the dictionary." *Derousse v. State Farm Mut. Auto. Ins. Co.*, 298 S.W.3d 891, 895 (Mo. banc 2009).

*Purchase*

As the majority notes, one dictionary defines "purchase" as "to obtain (as merchandise) by paying money or its equivalent: buy for a price." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1844 (1993). This definition addresses the "purchaser" side of a transaction but is silent about the "seller" side of the transaction. The majority affords legal significance to this silence and presumes the definition of "purchase" is broad enough to include transactions where a third party receives some benefit from the payment of money by a purchaser to a seller. In other words, in the context of this case, the majority would ascribe the word "purchase" not only to the transaction between Fugate and SBBT (where Fugate clearly paid money to SBBT to "buy" an RAL)

but also to the transaction between Fugate and Jackson Hewitt (where Fugate paid no money to Jackson Hewitt except for the service of tax preparation). I disagree with the majority's application of the dictionary definition of "purchase" in this manner, as it is inconsistent with the plain, ordinary, and usual sense of the word.

I suggest that the plain, ordinary, and usual sense of the word "purchase" anticipates a direct transaction between the buyer of a product or service and the seller of that product or service. For example, the purchaser of a residence is commonly understood to be so, but only with respect to the seller of the residence, and not with respect to the real estate broker all knew would derive a commission from the sale. The purchaser of retail goods is commonly understood to be so, but only with respect to the retailer selling the goods, and not with respect to the taxing authority for whom sales taxes were paid by the purchaser and collected by the retailer. The purchaser of an item consigned for sale is commonly understood to be so, but only with respect to the consignment shop, and not with respect to the person who consigned the item for sale. The purchaser of an extended warranty package on a vehicle is commonly understood to be so, but only with respect to the entity offering the extended warranty, and not with respect to the car dealer who may receive a fee from the sale. This "usual sense" of the word "purchase" is consistent with the manner in which the term has been construed by our courts. *See, e.g., Becker Elec. Co., Inc. v. Dir. of Revenue*, 749 S.W.2d 403, 407 (Mo. banc 1988) ("We hold that a purchaser ... is the person who acquires title to, or ownership of, tangible personal property, *or to whom is rendered services, in exchange for a*

*valuable consideration.*" (emphasis added)).

In fact, consistent with this "usual meaning," the word "purchase" is defined in BLACK'S LAW DICTIONARY 1234–35 (6th ed.1990) as the "[t]ransmission of property *from one person to another* by voluntary act and agreement, founded on a valuable consideration.... The term 'purchase' includes *any contract to purchase, or otherwise acquire.*" (Emphasis added.) Unlike the dictionary definition relied upon by the majority, this dictionary definition addresses *both* the "purchaser" and "seller" side of a purchase transaction and, in that regard, clearly envisions a *direct* transaction between the buyer and seller.

### In Return for the Payment of Money

The same plain, ordinary, and usual meaning should be ascribed to section 407.637.1's use of the phrase *in return for the payment of money or other valuable consideration.* The word "payment" is defined by BLACK'S LAW DICTIONARY 1129 (6th ed.1990) as:

> [T]he performance of a duty, promise, or obligation, or discharge of a debt or liability, by the delivery of money or other value *by a debtor to a creditor* .... A discharge in money ... of an obligation or debt owing by one person to another, and is made by *debtor's delivery to creditor* of money ... *and creditor's receipt thereof.*

(Emphasis added.) With respect to the latter portion of this definition, BLACK'S LAW DICTIONARY cites as authority *Allmon v. Allmon,* 306 S.W.2d 651, 655 (Mo.App.1957).

The phrase "in return" is defined within the definition of "return" by THE AMERICAN HERITAGE COLLEGE DICTIONARY 1167 (3rd ed.1993) as "in repayment or reciprocation."

Affording these words their collective plain meaning, the phrase "in return for the payment of money" clearly envisions a direct transaction between the provider of goods or services and the recipient of those goods and services.

I would conclude, therefore, *without* resort to rules of statutory construction, that the word "buyer" and the phrase "in return for the payment of money or other valuable consideration," when afforded their plain, ordinary, and usual meaning, reflect the legislature's intent to include within the ambit of the Act customary purchase transactions occurring directly between the seller of a service and the buyer of the service. As a result, I conclude that Fugate's allegations in her petition are facially insufficient to state a claim against Jackson Hewitt for violation of the Act.

If we presume, *arguendo,* that the word "purchase" and the phrase "in return for the payment of money or other valuable consideration" permit inconsistent, but equally plausible, interpretations, then section 407.637.1 would be rendered ambiguous. In such a case, rules of statutory construction would be employed to resolve the ambiguity. *Maxwell,* 190 S.W.3d at 610–11. These rules require us to construe section 407.637.1 in context and not in isolation. *State ex rel. Lebeau v. Kelly,* 697 S.W.2d 312, 315 (Mo.App.1985). "[S]ections of the statutes *in pari materia,* as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words" employed by the legislature. *State ex rel. Wright v. Carter,* 319 S.W.2d 596, 600 (Mo. banc 1958). The purpose of an entire act must be considered. *Neske v. City of St. Louis,* 218 S.W.3d 417, 424 (Mo. banc 2007). It is a "fundamental rule of construction that one part of a statute should not be read in isolation from the context of

the whole act." *Martinez v. State,* 24 S.W.3d 10, 18 (Mo.App. E.D.2000). "Because a statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent, each part should be construed in connection with other parts, and 'it is not proper to confine interpretation to the one section to be construed.'" *Id.* (quoting *Ferrell Mobile Homes, Inc. v. Holloway,* 954 S.W.2d 712, 715 (Mo.App. S.D.1997)).

The majority opinion appears to have viewed section 407.637.1 in isolation, with the skewed impression that a determination first had to be made that section 407.637.1 was ambiguous before the rule of construction requiring a section to be read and construed as a part of an entire Act could be employed. I believe this to be an inaccurate application of the rules of statutory construction.

Even if section 407.637.1 is construed in isolation, the majority has neglected to construe the phrase "in return for the payment of money or other valuable consideration" in context. Section 407.637.1 begins: "[a] credit services organization is a person who, with respect to the extension of credit by others." Fugate alleges in her petition that Jackson Hewitt obtained an extension of credit from SBBT *for her.* Fugate thus necessarily reads the aforementioned phrase as: "a credit services organization is a person who, with respect to the extension of credit by others *for a buyer,*" adding an unstated modifier.

Similarly, section 407.637.1 requires that a person who is alleged to be a credit services organization "provides or represents." Fugate alleges that Jackson Hewitt is a credit services organization, and thus necessarily reads this phrase to mean that a credit services organization is a person who "provides or represents *to a buyer,*" again adding an unstated modifier.

Section 407.637.1 continues to require that a person who is alleged to be a credit services organization provides or represents "that the person can or will provide any of the following services." Fugate alleges in her petition that the service provided by Jackson Hewitt was the service of obtaining an extension of credit *for her,* necessarily reading the aforesaid phrase to mean "that the person can or will provide any of the following services *to a buyer,*" an unstated modifier.

As to each of the aforesaid components of section 407.637.1 addressing the required predicate actions of a purported credit services organization, Fugate comfortably reads the predicate as limited by the unstated modifier *"for or to a buyer."* The same logic must be applied to the predicate of payment. Thus, where section 407.637.1 requires a purported credit services organization's action to have been undertaken "in return for the payment of money or other valuable consideration" the unstated modifier *"from a buyer"* must be presumed at the end of phrase to be consistent. I would thus conclude, reading the phrase "in return for the payment of money or other valuable consideration" in context with the balance of section 407.637.1, that the legislature intended the scope of section 407.637.1 to be limited to transactions where a purported credit services organization affords a described service directly to a buyer in exchange for payment directly from the buyer for that service.

I reach the same conclusion reading section 407.637.1 *in pari materia* with other sections of the Act, as is required. *Martinez,* 24 S.W.3d at 18. Section 407.638 describes the prohibited activities of a credit services organization. As an example, section 407.638(1) provides that a credit services organization may not *"[c]harge a buyer* or *receive from a buyer* money or

other valuable consideration before completing performance of all services the credit service organization has agreed to perform *for the buyer*" absent posting a bond. (Emphasis added.) This prohibited activity is clearly expressed in terms requiring a credit services organization to charge a buyer directly, or to receive payment from a buyer directly, in exchange for performing an agreed service, referring necessarily to one of the three services described in section 407.637.1. Similarly, section 407.638(2) provides that a credit services organization cannot "*[c]harge a buyer* or *receive from a buyer* money or other valuable consideration solely for referral *of the buyer* to a retail seller who will or may extend credit *to the buyer* if the credit that is or will be extended *to the buyer* is substantially the same as that available to the general public." (Emphasis added.) Once again, this prohibited activity speaks expressly of a scenario where the purported credit services organization directly charges a buyer, or receives payment directly from a buyer, for the provision of the specified service.

Reading section 407.637.1 *in pari materia* with section 407.638, I conclude that the definition of "credit services organization" was intended by the legislature to be limited to transactions where a purported credit services organization provides one of the services described in section 407.637.1 directly *for or to a buyer* in exchange for payment directly *from the buyer*. In fact, to conclude otherwise would lead to an absurd result. If "credit services organization" is interpreted as suggested by the majority, then the class of persons included within the definition of "credit services organization" will be broader than the class of persons subject to the restrictions

set forth in section 407.638. I do not believe the legislature intended such an incongruent result. It is a "vital canon of construction . . . that an ambiguous statute will not be construed so as to work an unreasonable or absurd result." *State ex rel. Sch. Dist. of Kansas City v. Young*, 519 S.W.2d 328, 333 (Mo.App.1975) (citing *State ex rel. Dravo Corp. v. Spradling*, 515 S.W.2d 512, 517 (Mo. banc 1974); (other citations omitted)).

Fugate argues that interpretation of section 407.637.1 must be controlled by section 407.637.2, which lists ten professions that are exempt from the Act. These include, among others, real estate brokers, lawyers, and stocks and commodities broker-dealers. Fugate argues that had the legislature intended to exempt tax preparers, then it would have listed tax preparers in section 407.637.2. The majority was persuaded by Fugate's argument. The fallacy in Fugate's argument, however, is that it presumes the definition of "credit services organization" applies to Jackson Hewitt as to require the need to resort to an exemption. I have already concluded that unless a tax preparer is *paid directly* by a taxpayer for the service of obtaining an RAL, then the tax preparer is not a credit services organization. It is axiomatic that Jackson Hewitt did not need to rely on an exemption to escape the application of the Act if the Act did not apply to its conduct in the first place.[1] Fugate's, and thus the majority's, focus on who is (or is not) exempt from the Act puts the cart before the horse.

I acknowledge Fugate's argument that the construction of section 407.637.1 to exclude transactions which indirectly result

---

**1.** I observe that tax preparers who directly charge and are paid a fee by the consumer tax payer to either obtain a third party lender to extend an RAL or to themselves extend an

RAL, would fall within the definition of "credit services organization" and would not, as Fugate correctly notes, be exempt under section 407.637.2.

in a third person receiving money, as in this case, could permit credit services organizations to shield themselves from the Act by creating "straw parties" for the acceptance of payment. Though I am cognizant of this possibility, I note Fugate has not alleged that SBBT was a "straw party" for Jackson Hewitt, rendering Fugate's policy argument inapplicable to the facts of this case. Moreover, a court faced with different allegations in a petition will remain free to determine that existing substantive principles of law could permit the conclusion that payment by a buyer to one entity is legally indistinguishable from payment by the buyer to the entity claimed as the credit services organization. Fugate's petition, however, does not allege facts which would permit exploration of liability on such grounds. Nor is liability on such grounds argued by Fugate as a means of salvation for her petition.

Regardless of the merit, if any, in Fugate's expressed concern, the fact remains that we are obligated to construe section 407.637.1 to ascertain legislative intent, even if that construction permits an undesirable or unintended consequence. *Miles v. Lear Corp.*, 259 S.W.3d 64, 69 (Mo.App. E.D.2008) ("[U]nintended consequences are best resolved by the legislature, not the judiciary."). The legislature remains free to amend section 407.637.1 if and as it sees fit to prevent the scenario about which Fugate expresses concern.

In light of the foregoing, I conclude that Fugate's allegation that Jackson Hewitt was indirectly paid by her for obtaining an extension of credit was not sufficient to plead that Fugate was a "buyer" with re-

spect to her relationship with Jackson Hewitt, or that Jackson Hewitt was a "credit services organization," pursuant to the provisions of the Act. I believe the circuit court correctly dismissed Fugate's petition and that Fugate's first point should be denied.[2] I would affirm the circuit court's dismissal of Fugate's petition for failing to state a claim under the Act. Consequently, I would also affirm the circuit court's dismissal of Fugate's Merchandising Practices Act claim, which was predicated upon her claim under the Act.

Fugate's second point on appeal relates to whether she sufficiently pled an injury due to Jackson Hewitt's noncompliance with the Act as to avoid dismissal of her petition. Because I conclude that the trial court otherwise correctly dismissed Fugate's petition, I have not addressed Fugate's second point.

---

2. This is a case of first impression in Missouri. The parties have tendered competing authority from other jurisdictions construing similar statutes and addressing whether tax preparer RAL loans, and more specifically, indirect RAL transactions, were intended by that jurisdiction's legislature to be included within the scope of the applicable statute. Based on these competing authorities, I could cite to nonbinding, but persuasive, authority for the positions advanced by both Fugate and Jackson Hewitt. The competing authorities, therefore, afford no meaningful guidance in construing our Act.